COMMONWEALTH *vs.* DAVID P. BORANS.

Suffolk. May 7, 1979. — September 4, 1979.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Directed verdict, Grand jury proceedings, Trial of indictments together, Disclosure of statements by witness. *Perjury. Subornation of Perjury. Conflict of Interest. False Pretenses. Accessory and Principal. Joint Enterprise. Evidence,* Common criminal enterprise, Other offense, Relevancy and materiality, Cross-examination.

False testimony given to a grand jury was not rendered immaterial to the issue in question under G. L. c. 268, § 1, by the fact that other witnesses had already provided the grand jury with a sufficient basis for indictment. [135-137]

Upon appeal by a defendant convicted of perjury in his testimony before a grand jury, an examination of the defendant's entire grand jury testimony did not support his contention that his answers had been ambiguous and equivocal. [137-138]

Upon appeal by a defendant convicted of perjury in his testimony before a grand jury, there was no merit to the defendant's contentions that he was forced either to give incriminating evidence or perjure himself and that he was brought before the grand jury for the purpose of trapping him into perjury. [138-139]

At the trial of a defendant charged with perjury in his testimony before a grand jury, there was ample evidence to warrant the submission of the charge to the jury. [139]

At the trial of a defendant charged with subornation of perjury, there was sufficient evidence to warrant the jury in finding that the defendant actually procured a witness's perjury in a grand jury proceeding by persuading the witness to testify falsely. [139-141]

At the trial of a defendant charged with violations of G. L. c. 268A, § 2(*b*), evidence from which the jury could reasonably conclude that the defendant was aware of a kickback scheme and that he committed overt acts in furtherance of the scheme was sufficient to warrant the submission of the charges to the jury. [141-144]

Submission by a city's purchasing agent of a change order credit with the amount therein reduced as part of a kickback scheme constituted a false presentation of a bill for labor and materials sufficient to support a conviction of larceny by false pretenses. [144]

At a criminal trial, there was sufficient evidence to warrant a finding that the defendant was guilty as an accessory after the fact to a felony in connection with a kickback scheme. [144-145]

At the trial of a city's purchasing agent on various charges arising from a kickback scheme, conversations involving the city's mayor and others, at which the defendant was not present, were admissible because the defendant was involved in a joint criminal enterprise with the mayor and others and because he was charged with being an accessory after the fact to a felony committed by the mayor. [145-148]

At the trial of a defendant on charges arising from two kickback schemes and on an indictment charging him with perjury, the judge did not abuse his discretion in denying the defendant's motion to sever. [149]

At a criminal trial, the judge did not abuse his discretion in refusing to permit the defendant to cross-examine prosecution witnesses concerning their knowledge of the maximum penalties for crimes for which they either had been or could be charged where the judge allowed the defendant considerable latitude in questioning the witnesses with respect to such crimes and where many of the charges against witnesses were similar to those faced by the defendant. [150-151]

At a criminal trial, the judge did not err in refusing to require the assistant district attorney to turn over notes made by the assistant district attorney and his investigators relating to Commonwealth witnesses. [151]

INDICTMENTS found and returned in the Superior Court, nine on December 2, 1976, and one on May 27, 1977.

The cases were tried before *Donahue*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Edward T. Dangel, III (Victor J. Garo & Michael K. Mattchen* with him) for the defendant.

*Robert J. Schilling*, Special Assistant to the District Attorney *(Carol Anne Fagan*, Legal Assistant to the District Attorney, with him) for the Commonwealth.

ABRAMS, J. David Borans, formerly the purchasing agent for the city of Revere, appeals ten convictions stemming from allegations of corruption in the construction of a new

high school in Revere.[1]  We granted Borans' motion for direct appellate review.  We affirm the convictions.

Borans argues numerous assignments of error on appeal. Specifically, Borans claims that the judge erred in (1) refusing to direct a verdict of acquittal of the charges against him; (2) admitting as evidence conversations held in the absence of the defendant; (3) denying the defendant's motion to sever; (4) refusing to permit the defendant to cross-examine witnesses concerning their knowledge of the maximum penalties for certain crimes; and (5) refusing to require the assistant district attorney to furnish defendant with notes of interviews with Commonwealth witnesses.

The Commonwealth's theory is that, from the outset of Mayor William Reinstein's administration, there existed two schemes to compel contractors and vendors to make campaign contributions in exchange for public contracts. The first scheme sought a twenty-five thousand dollar kickback from Simon Sharigian, President of Si Associates, the contractor who was selected by the mayor to provide the specifications for the various categories of furnishings and interior equipment for the high school.  The second scheme required Sharigian to solicit those contractors (vendors)[2] interested in bidding for contracts to provide individual cate-

---

[1] Borans was convicted on ten indictments alleging a conflict of interest under G. L. c. 268A, § 2(b) (six indictments) larceny, accessory after the fact to a felony, perjury and subornation of perjury.

The judge sentenced Borans to concurrent terms of from six to nine years' imprisonment for the crimes of perjury and subornation of perjury. The judge also sentenced Borans to terms of from four to five years' imprisonment for the crime of larceny and for the crime of being an accessory after the fact.  He sentenced Borans to terms of two and one-half to three years' imprisonment for each of Borans' convictions of violations of G. L. c. 268A, § 2(b).  The eight sentences were to be served concurrently with the perjury and subornation of perjury sentences.  In December, 1978, the sentences were reduced by the judge to time served, and Borans was placed on unsupervised probation for the remainder of the terms.

[2] A vendor is a person or "firm that would sell the equipment, be awarded the contract by the purchasing agent, by the City of Revere or the high school."

gories or items of furnishings and equipment. Sharigian was to determine whether — and how much — these individual contractors would be willing to pay as a kickback to city officials in return for being awarded contracts with the city of Revere.

Those involved developed well concealed schemes for bribery and kickbacks under the guise of legitimate transactions. The participants also sought to camouflage the kickbacks in a variety of ways, including false and backdated invoices and correspondence, as well as requests for the purchase of tickets for political fund raising dinners and by giving false testimony before the grand jury. The Commonwealth's evidence discloses a shocking betrayal of the public trust. According to the evidence, Borans misused the power of his office to induce political contributions to the mayor. Borans also actively participated in two schemes to siphon funds from the Revere public treasury for the private gain of public officials.

The following is a capsulized version of the evidence against Borans viewed in the light most favorable to the Commonwealth.[3] In January of 1972, William Reinstein took office as the mayor of Revere. Reinstein immediately appointed Borans, who had managed Reinstein's campaign, to the position of purchasing agent for the city.

### The Twenty-Five Thousand Dollar Payment by Sharigian

At the time Reinstein and Borans took office, the new Revere high school was in the early stages of construction. Harold M. Turiello, the architect who had designed the structural aspects of the school, had been authorized by the previous mayor of Revere to begin the internal nonstructural specification work for the furnishings and equipment.[4]

---

[3] In order to segregate the two schemes and the subsequent attempts to disguise their existence, the summary of the evidence will be divided into three sections: (1) the direct payment by Sharigian; (2) Sharigian's solicitation of payments from other contractors; and (3) the testimony before the grand jury.

[4] The work of the "specifier" generally involves four stages: first, the specifier consults with members of the school department and with faculty

Turiello began work, and in January and July of 1972, Turiello sent bills to the city for consultation work and for the preparation of preliminary studies. These bills were paid by the city after Turiello's contract was examined by the city solicitor.

In late February, 1972, Turiello met with Reinstein at the construction site.[5] Reinstein told Turiello, "I want to speak very frankly with you. I want you to join my team. We could work in harmony together. . . . There are tickets to be bought, functions to be held, activities that we can become involved with. . . . You can see that you can make me very happy." Turiello did not respond to these overtures or to overtures made by Reinstein in the spring.

Finally, in mid-July, Reinstein approached Turiello at the construction site. Reinstein said to Turiello, "Say, there, Harold, I am goddam fed up with you. You're a cheap s.o.b. You're dancing me around." Reinstein also told Turiello that he (Turiello) "should have been a priest." Reinstein then turned and walked away.

On September 12, 1972, Turiello was summoned to Mayor Reinstein's office. When he arrived, Turiello found Borans seated in the office with the mayor. Borans opened the conversation by telling Turiello to remain calm and not to "become emotional." Reinstein then told Turiello that "I have decided to dispense with your services on the furnishings and equipment phase." Reinstein refused to give Turiello a reason for his decision.

---

members concerning furnishings and equipment; second, the specifier prepares preliminary studies for the furnishings and equipment; third, the specifier prepares descriptions of the required furnishings and equipment for prospective bidders; finally, the specifier checks the equipment and furnishings as they arrive to ensure that the proper materials have been delivered. The specifier also tests the installed equipment to make certain that the installation is proper and that the equipment is in good operating order.

[5] The statement of facts contains conversations to which the defendant duly objected. Since we find no error in their admission, we have included them. See infra at 145-148.

During the late spring of 1972, a partner in an office equipment supply business located in Worcester was asked whether his firm would be interested in doing the interior specifications work. Shortly thereafter, the partner met with Borans in Borans' office at the Revere city hall. The two men spent approximately twenty minutes discussing the details of the Revere high school work, and the partner left to prepare the proposal to be made by his firm. The Worcester firm's bid for the interior specifications work, totalling $84,000, was mailed to Borans on October 13, 1972.

Approximately two weeks later, a meeting was arranged with Reinstein and Borans, the Worcester contractor and others. Reinstein first asked about the firm's qualifications and experience. Then Reinstein said, "You understand that if you get this job there would have to be a ten thousand dollar contribution in cash?" The contractor responded that "I don't know how we'd come up with ten thousand dollars." The mayor then "mentioned something about a tax affair." The contractor told Reinstein that he would "have to go back and talk to [his] partner." Borans said nothing during the meeting. The Worcester firm had no more contacts with Revere officials, and was not awarded the contract.

In early November, 1972, Simon Sharigian received two telephone calls from one Frank Bowden.[6] At this time, Sharigian was in the process of forming a firm, Si Associates, to do interior design, furnishings and purchasing for commercial interiors.[7]

Bowden first told Sharigian that there was a contract available for the furnishings and equipment specification work for the new Revere high school. Next, Bowden told Sharigian that Sharigian "had the inside track on the contract that was available and it involved a sizeable amount of money." However, Bowden told Sharigian that some of the

---

[6] Bowden testified at trial under a grant of immunity. Bowden said that he was promised $5,000 if he could convince Sharigian to "play ball."

[7] Si Associates was formally incorporated in January, 1973.

work had already been done, and, "You're going to have to get involved with quite a bit of money thrown back on this particular contract." When Sharigian expressed interest in the plan, Bowden said that Sharigian would be receiving a call from a Robert Tobin.

Shortly thereafter, Sharigian received a call from Tobin, a Suffolk County deputy sheriff, who arranged a meeting to be held in the sheriff's office at the Suffolk County court house. At the meeting, Tobin handed Sharigian a copy of the $84,000 bid proposal submitted by the Worcester firm.

Tobin then asked Sharigian how much money Sharigian would need to do the same job. Tobin said, "You're looking at a document here for eighty-four thousand dollars. This is what we are talking about. How much can we realize back on this end? How much do you think you can do the job for? What do you think you can get back for us on this in terms of money?"

Sharigian asked Tobin how much the Worcester firm had offered. Tobin responded, "He only would throw back ten thousand dollars. He is out of the picture." Sharigian then offered to "throw back forty thousand, maybe half." Tobin agreed, but insisted that all or "a good portion of this forty thousand has to be in cash." Tobin then told Sharigian to prepare a proposal for the job under Sharigian's firm's name and to address the proposal to Borans.

The following day, Friday, November 24, 1972, Sharigian prepared a proposal in the name of Si Associates. He then took the papers to Tobin's office. Tobin looked at the proposal and handed Sharigian two copies of the actual contract for the job. The contract between Si Associates and the city of Revere was finally approved on December 22, 1972.

In the middle of March, 1973, Sharigian again met with Tobin at Tobin's office in the Suffolk County court house. Sharigian explained to Tobin that the work was more difficult than Sharigian had anticipated. He then informed Tobin that his firm would only give Tobin twenty-five thousand dollars instead of the agreed-upon forty thousand

dollars. Tobin agreed, and told Sharigian to make out two checks: one in the name of Francis B. Bowden for seventeen thousand dollars, the other to Jack B. Stone for three thousand dollars. Tobin also told Sharigian that he (Tobin) wanted five thousand dollars in cash, but Sharigian responded that the cash payment would have to be delayed.

On March 19, 1973, Sharigian made out the checks. While each check relates that the check was for "Services to Si Associates on Revere High School," neither Bowden[8] nor Stone ever did work for Si Associates. The same day, Sharigian personally delivered the checks to Tobin.[9]

Around this time, Borans telephoned Stone and asked Stone to come to his (Borans') office at Revere City Hall. When Stone arrived at Borans' office, Borans told him that he (Borans) felt that Stone was a "very good friend." Borans then asked Stone to "do him a favor." Borans said that Sharigian owed him (Borans) "a personal debt of three thousand dollars." Borans said that Sharigian had "a contract with the City of Revere to do the interior work for the new Revere High School." Borans added that "being an official of the City of Revere, he didn't want to see the check." Borans asked Stone to accept the check from Sharigian and send Si Associates a bill for $3,000. Borans then said, "When you receive the check, cash the check and bring it over to me." Borans promised that Stone "would possibly get some future work from the city of Revere." Although Stone was "reluctant," he agreed to Borans' plan.

A few days later, Stone received a check for $3,000 from Si Associates, signed by Sharigian. Stone called Borans, who repeated his earlier instructions to cash the check and bring the money to him (Borans). When Stone brought the money, Borans counted it and then thanked Stone.

---

[8] Bowden kept five thousand dollars as a "finder's fee" and issued a twelve thousand dollar check from his own account to Tobin.

[9] In early May, 1973, Sharigian gave Tobin an envelope with three thousand dollars in cash, and said that Tobin would have to wait for the remaining two thousand dollars. See *infra* at 125-126.

In late July or early August of 1973, Borans and Paul Martel, an architectural draftsman employed by Si Associates, drove to Beverly to inspect certain office equipment under consideration for the Revere high school. During the return trip, Borans told Martel that "you and Si are doing a really fine job on the school." Borans alluded to the possibility of future contracts with the city, and Martel responded that Si Associates did not wish to be considered for future contracts with the same kickback arrangements. Martel said that Si Associates had already paid over twenty-five thousand dollars, and that, "[t]his is ridiculous, totally absurd, the kinds of money we're throwing back." Borans responded,[10] "The Mayor only expected eight or ten thousand out of this entire contract.[11] As far as I know, he's only gotten about three thousand dollars cash." Borans also told Martel that "in the future what you would have to kick back would be about 10%, and that 10% amount would be 10% of your fee and there would be consideration taken out for income taxes." Shortly thereafter Reinstein had lunch with Borans and Sharigian. Reinstein said that in the future Sharigian should work with Dave Borans or Ronald Paone, the clerk of the works.

Paone called Sharigian in early November, 1974, and asked to meet with Sharigian. At the meeting Paone told Sharigian that "the Mayor was looking for the two thousand dollars that was still owed him." Sharigian and Paone agreed that Sharigian would purchase fifteen one hundred dollar tickets to a Reinstein fund raising event. Paone said that with the purchase of the tickets "we'll call it even." Sharigian said that he would have to write postdated checks

---

[10] Borans first asked, "What are you talking about?" The jury could have found that Borans' comment expressed surprise at the amount of the kickback, and not at the fact that a kickback had been paid.

[11] Borans repeated this comment a few days later when Martel came to his (Borans') office. Borans said that the "Mayor was upset at the fact that twenty-five thousand had been paid and he [the mayor] had only expected us [Si Associates] to pay him eight to ten thousand dollars."

to cover the tickets. Paone "agreed to that." Sharigian's checks were presented for payment and on two occasions the bank returned the checks because Sharigian's account contained insufficient funds.

At the time Sharigian's checks bounced, the city of Revere owed Si Associates around $7,700 and Sharigian owed Martel five thousand dollars. Martel went to Borans and said, "Dave, help me [Martel] out." Martel told Borans that he (Martel) could only get his (Martel's) money if the city paid Si Associates. Borans said he would speak to Reinstein.

Thereafter Borans told Martel that the "City of Revere would release a check for $3,500 . . . and . . . [Martel] was to give them $800 . . . as a sign of good faith." When "they got this . . . then they would release the second $3,500 and [Martel] would give them . . . the balance." Martel brought the money from the first check to Borans. Borans suggested it be given "to Billy" (Reinstein). Martel said he'd "just as soon give it to you [Borans]." Borans replied, "Fine. The next check will be on its way." On receipt of the second check Martel brought Borans "the balance of the $1,500."

### Sharigian's Solicitation of Vendor Payments to Revere Officials

During the third week of January, 1973, shortly after Sharigian began work on the firm's contract as specifier for the high school, Sharigian met with Reinstein at the mayor's office. The mayor assured Sharigian that he (Reinstein) had assembled an efficient organization. Then Reinstein said, "You have a pretty good idea what we are involved with here. You have had a chance to review the categories and talk to a few of these people [vendors]." Then, pointing to himself, Reinstein asked, "How much can we expect back on this end?"

When Sharigian responded that he had no idea, Reinstein asked, "Well, isn't it standard, isn't it fair to say that a standard ten percent is the usual kickback fee on contracts? . . . Do you have any idea? A hundred thousand? Fifty thousand? Twenty thousand?" Sharigian told Reinstein

that he (Sharigian) would "relate this conversation" to Martel, and "we will get the ball rolling for you."

Sharigian returned to his office and informed Martel of the details of his conversation with Reinstein, making Martel fully "aware of the fact that this was going to take place out of our office." Martel and Sharigian were to "solicit individual vendors as they came into our office, making them aware there was something down there, and the thing was it was going to be for the Mayor's campaign." Martel was to prepare and keep a list of the vendors and their proposed "contributions," and "the Mayor said that we would be working with Mr. Borans on this. We were to keep him [Borans] informed."

Throughout 1973 and early 1974, as Sharigian and Martel prepared the specifications for the various categories of interior furnishings and equipment for the high school, they interviewed prospective vendors. The interviewing process included not only discussion of specifications and prospective bids, but also solicitations by Sharigian and Martel of vendor kickbacks to Reinstein in the form of "campaign contributions." Martel kept Borans continually informed of "all the activity" of Si Associates.

In early 1974, Martel was summoned to a Saturday morning meeting with Reinstein and Paone, at Reinstein's home in Revere. Paone said, "We want you to give us the names of the people that are going to pay off to us." Martel took out the list of all the vendors who were to provide furnishings and equipment for the high school and began to read off the amounts which the vendors were willing to pay. Paone asked Martel for the total figure, and Martel responded that the total was "fifteen or sixteen thousand dollars." A few days later, Martel met with Borans at Borans' office. Borans asked Martel to give him (Borans) a "duplicate list" of the amounts which the vendors had "agreed to kick back." Martel made out the list and gave it to Borans.

While a relatively large number of vendors were apparently involved in the vendor kickback scheme, we detail only the circumstances surrounding payments by the R.G. Shiers

Company and by Smith Associates, whose payments are the subject of specific charges against Borans.

Among the vendors solicited for kickbacks by Sharigian was Richard Shiers, the president of R.G. Shiers Company. Shiers was interested in bidding on two contracts: one for the school's curtains and draperies, and the other for the stage curtains. Sharigian explained to Shiers that "in order to be a successful bidder on the job there would have to be a contribution to Mayor Reinstein's campaign fund." Shiers agreed.

On June 6, 1973, Shiers met with Sharigian at Sharigian's office to work out the details of Shiers' payment to Reinstein. "We determined that there would be a twenty-five-hundred-dollar kickback on both contracts," for a total payment of five thousand dollars. Shiers "indicated to Si [Sharigian] that I would include that amount of money in my bid price for both contracts."

On July 12, 1973, before the two contracts were put up for bids, Shiers met with Borans to discuss the kickbacks. Borans "indicated that the amounts had been discussed with Mayor Reinstein and the amounts were acceptable." Borans, however, was concerned that Shiers might be the only bidder for the stage curtain contract and asked if Shiers "could possibly get another bidder just to add authenticity to our own bid." Borans assured Shiers that even if Shiers' bid were not the low bid for the contracts that Shiers' firm would be awarded both contracts. Shiers subsequently provided Borans with the name and address of an Alabama firm which was willing to file a bid.

The deadline for the submission of bids for each of the two contracts was October 11, 1973. Shiers' firm did not submit a timely bid for the stage curtain contract because Shiers' messenger brought the bid to Sharigian instead of Revere City Hall. Shiers' firm also was not the low bidder for the draperies contract. The following day, Shiers met with Borans and Sharigian. The three men decided that the best plan would be to find a way to reject all timely bids for the stage curtain contract and to disqualify the low bidder for the draperies contract.

Borans' position was that "if we have to rebid this thing four, five, six times, the bid is definitely going to the R.G. Shiers Company." Subsequently, the low bidder for the draperies contract was disqualified and Shiers' firm was awarded the contract. All timely bids for the stage curtain contract were also disqualified, new bids were solicited and Shiers' firm was awarded the contract.

After Shiers began work, he determined that the installation of stage curtains would cost less than originally anticipated. Accordingly, Shiers sent a "change-order"[12] letter to Sharigian which stated: "The changes which have been incorporated into the shop drawings will allow us to offer a credit of seven thousand, six hundred fifty dollars to the City." A copy of the letter was sent to Borans, who told Shiers that he had received the change-order letter but that he was reluctant to act on it.

Shortly thereafter, Shiers met with Paone who asked Shiers to make an initial payment on Shiers' kickback agreement. Shiers agreed to make out a check for $2,000 to Si Associates and that, in turn, Sharigian would make out a check to "the people in Revere." This arrangement was completed by the end of April, 1974.

Shiers again met with Paone in July of 1974. Paone explained to Shiers that he (Paone), Reinstein and Borans were dissatisfied with Si Associates' "collection bureau." Reinstein, Borans and Paone had decided that "Paone would now be the fellow that was handling future kickback payments." Paone then suggested that Shiers increase the amount of his kickback. When Shiers resisted, Paone commented on Shiers' proposed credit to the city of $7,650 and suggested that this money from the credit be given to Reinstein.

Shiers agreed to give an additional $5,000 to Reinstein by crediting the city only $2,650. However, Shiers told Paone

---

[12] A "change-order" is an alteration in the contract originally agreed to by the city and the contractor. A change-order may involve either an increase or a decrease in the contract price, or may involve an alteration in the type of equipment or service provided by the contractor.

that he could make no further kickback payments until he received some money on his contracts with the city of Revere. A few days later, Shiers received a call from Borans who said that the city would issue a check shortly. Borans then told Shiers to "make arrangements with Mr. Paone to complete the transaction."

By early October, 1974, Shiers had made kickback payments totalling $7,500. On October 3, 1974, Shiers spoke with Borans, who "wanted us to complete our previously stated arrangements and complete the ten-thousand-dollar kickback." Shiers then met with Paone in the parking lot of the high school on October 16 and handed Paone a check for $2,500, thus completing his payment of the ten thousand dollar kickback.

A second vendor solicited by Sharigian and Martel was Smith Associates. This firm was awarded the library furniture and shelving contract for the high school in the amount of $81,997. Prior to the time that the firm submitted the bid, Robert B. Davidson, a salesman for Smith Associates, met with Martel at the offices of Si Associates to discuss the fact that change orders increasing the contract price would be issued on the contract after it was awarded, adding certain items of equipment.

Martel told Davidson that "he [Martel] had known the Mayor of Revere, Mayor Reinstein, for practically all his life, but until a couple of months ago he didn't know that he was a crook." Martel then said that "on the change orders that would be coming through that we would kick back fifteen per cent to the Mayor." Martel then said that the fifteen per cent kickback "was not coming out of [Smith Associates'] pocket. We were to take our material costs and add a fifteen percent." Davidson said that he would inform the president of Smith Associates, who later approved the arrangement. Eventually, four change orders totalling approximately $25,000 were issued for Smith Associates after being approved by Borans.

In November, 1974, Davidson spoke to Borans about the fact that the city had not yet paid Smith Associates. Borans

responded, "Well, where's our money?" Davidson answered that Smith Associates had agreed to pay a $2,700 kickback and that the firm would pay nothing until it (Smith Associates) received payment from the city. On November 7, a check was issued to Smith Associates.

Martel then informed Davidson that the $2,700 payment would be made to Paone. On November 11, 1974, the president of Smith Associates gave Davidson a plain brown envelope containing $2,700 in cash.[13] Davidson took the envelope to a restaurant in Revere, where he met Paone. After the two men had coffee, Davidson "took the envelope out of [his] pocket and . . . slipped [it] under the table . . . to him." The two men then left the restaurant and "went our separate ways."

*Testimony before the Grand Jury*

Borans testified before the grand jury on June 28, 1976.[14] During the course of his testimony, Borans denied any knowledge of a kickback payment from Simon Sharigian to Mayor Reinstein or any of Reinstein's associates.[15]

---

[13] In order to "clean[ ] this particular amount through the books of the corporation," the president of Smith Associates, Albert F. Smith, Jr., wrote a $2,900 check for fictitious services rendered to a third party who cashed the check, kept $200 as a "service" fee and returned the remainder to Smith.

[14] Borans also testified before the grand jury on June 29, 1976, and on September 2, 1976. However, the perjury indictment relates only to Borans' testimony on June 28.

[15] Among others, Borans was asked the following questions and gave the following answers in his testimony before the grand jury on June 28, 1976:

"Q. Were you aware of any kickback that was made by Si Sharigian for his contract?

"A. No.

"Q. And is it fair to say even today you have no knowledge of Si Sharigian having had to kickback any money?

"A. No knowledge, no.

"Q. You have no personal knowledge that Si Sharigian or Paul Martel had to kickback any money?

"A. No, not for the contracts. They have bought tickets.

"Q. Other than the tickets?

"A. No.

. . .

After Borans' testimony for the day was concluded, Borans returned to the district attorney's office with the assistant district attorney and with Charles McNally, the investigator for the Suffolk County district attorney's office who was in charge of the Revere high school investigation. The three men arrived at the office at approximately 5 P.M. After arriving, "Borans acknowledged that he was here on a voluntary basis and agreed to be interviewed, adding that he had nothing to hide. . . ." Borans repeatedly denied any personal knowledge of a kickback scheme.

At approximately 9 P.M., the assistant district attorney terminated the interview. As Borans prepared to leave, he told McNally, "I picked up the money from Bob Tobin and delivered it to Reinstein." McNally asked Borans to repeat the statement to the assistant district attorney. Borans did so, adding that he saw Reinstein take the money out of the envelope and put it in his (Reinstein's) coat pocket. However, Borans said that he would deny making this statement before the grand jury, if asked, and he would continue to deny knowledge of any payments from Si Associates to Rein-

---

"Q. Recall Martel stating to you that they didn't want anymore jobs in Revere if they had to pay twenty-five thousand dollars?

"A. I would recall that.

"Q. But it didn't happen?

"A. No.

. . . .

"Q. Did you ever find out that Si Sharigian gave twenty-five thousand dollars in checks to Bob Tobin in 1973? Ever find that out?

"A. I don't even know it.

"Q. You never heard of that?

"A. No.

"Q. Ever discuss with anyone in 1973 anything to do with Si Sharigian giving money to Bob Tobin?

"A. No.

. . . .

"Q. Isn't it true that you were totally shocked that Si Sharigian gave over twenty thousand dollars to Bob Tobin because you thought all he had to give was eight thousand dollars?

"A. I have no direct or indirect knowledge of that. Never said it or heard it."

stein. Borans said that he would cooperate with the district attorney's office only after the grand jury returned indictments against the other participants in the scheme and did not indict Borans. When the assistant district attorney rejected this arrangement, Borans left the office.

In late May and early June of 1976, Stone, the recipient of the $3,000 check, had frequent conversations with Borans concerning the ongoing investigation of the alleged kickbacks. On each occasion, Borans told Stone to say that he (Stone) had actually done consulting work for Si Associates.

On July 12, 1976, Stone met with Borans at Borans' office. Stone told Borans that he (Stone) would be testifying before the grand jury the following day. Borans told Stone, "Well, stick to the story, that you did consulting work for Si Associates and there'll be no problems and there is nothing to worry about." Borans also told Stone "that Si Sharigian would back [Stone] up."

On July 13, 1976, Stone testified before the grand jury. Stone testified that he had done consulting work for Si Associates. Stone testified that the $3,000 check which he received from Sharigian was in payment for Stone's consulting services and that Stone had in fact "rendered three thousand dollars' worth of services." Before the grand jury, Stone denied "participat[ing] in a scheme whereby the proceeds, either all or part of that three thousand dollars, was funneled back to anyone in the City of Revere." The same evening, Stone spoke with Borans. "He asked me did I stick to the story, and I told him I did."

On July 15, Stone again appeared before the grand jury. Stone repeated his story that he performed "at a minimum, a three-thousand-dollar service to Si Associates." Stone also denied sending an invoice to Sharigian "to cover up the three-thousand-dollar payment."

On December 2, 1976, Stone was arraigned on an indictment charging him with perjury before the grand jury in his testimony of July 13 and 15. Stone pleaded not guilty. On May 27, 1977, Stone returned to court and pleaded guilty

to the indictment charging him with perjury before the grand jury.[16]

I. *Directed Verdicts.*

Borans asserts that the judge should have granted his motions for directed verdicts of acquittal, made at the close of the Commonwealth's case, on the indictments against him. In reviewing the denial of a motion for directed verdict, we consider only the evidence introduced up to the time the Commonwealth rested its case. *Commonwealth v. Clark,* 378 Mass. 392, 403-404 (1979). *Commonwealth v. Amazeen,* 375 Mass. 73, 80 (1978). *Commonwealth v. Kelley,* 370 Mass. 147, 150 (1976). To determine whether there was sufficient evidence of the defendant's guilt to warrant the submission of the charges to the jury, the test is "whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient, as to each indictment, to permit the jury to infer the existence of the essential elements of the crime charged in that indictment." *Commonwealth v. Sandler,* 368 Mass. 729, 740 (1975). See, e.g., *Commonwealth v. Dunphy,* 377 Mass. 453, 455-456 (1979); *Commonwealth v. Tabor,* 376 Mass. 811, 824 (1978); *Commonwealth v. Kelley, supra.* Moreover, "the evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth v. Latimore,* 378 Mass. 671, 677 (1979), quoting from *Commonwealth v. Cooper,* 264 Mass. 368, 373 (1928). See *Commonwealth v. Campbell,* 378 Mass. 680, 685-686 (1979). Accord, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

---

[16] During the course of Stone's testimony at Borans' trial, Stone was asked: "Mr. Stone, on each and every one of these thirty occasions that you lied on the July 15th and July 13th Grand-Jury hearings, you did so at the request of David Borans, this individual seated at this table right here. Is that correct?" Stone answered, "That is correct."

have found the essential elements of the crime beyond a reasonable doubt" [emphasis in original]). Applying this test, we conclude that there was ample evidence to permit the jury to find the defendant guilty of each of the crimes charged.

A. *Perjury.*

Borans argues that the judge erred in denying his motion for a directed verdict of acquittal of the charge of perjury. Borans asserts that the Commonwealth failed to demonstrate that Borans' allegedly false testimony before the grand jury was material to the grand jury investigation. Further, he maintains that the questions asked of him before the grand jury — and his responses thereto — were ambiguous and equivocal. Finally, Borans claims that the grand jury proceedings were invalid as to him because he was "brought before the Grand Jury in order to extract perjured testimony from him." Thus Borans concludes that the judge should have directed a verdict of acquittal of the charge of perjury. We do not agree.

To sustain a conviction for perjury, false testimony must be given "in a matter material to the issue or point in question." G. L. c. 268, § 1. See *Commonwealth* v. *Louis Constr. Co.*, 343 Mass. 600, 606-607 (1962); *Commonwealth* v. *Pollard*, 12 Met. 225, 229 (1847). Moreover, it is well established that "[m]ateriality in respect of perjury means relevance in the sense that the answer might tend in reasonable degree to affect some aspect or result of the inquiry." *Commonwealth* v. *Cerveny*, 373 Mass. 345, 352 (1977), quoting from *Commonwealth* v. *Giles*, 350 Mass. 102, 110 (1966). See *Commonwealth* v. *Grant*, 116 Mass. 17, 20-21 (1874).

Borans does not disagree that his false testimony before the grand jury concerning payments by Simon Sharigian was material to an issue well within the legitimate scope of the grand jury's inquiry. Borans asserts, however, that his "testimony certainly had no practical effect on the decision to return indictments" because other witnesses had already provided the grand jury with a "more than sufficient . . .

[basis] for indictment." Thus Borans concludes that his testimony was immaterial to the grand jury investigation.

Borans' argument that his testimony had no *actual* effect on the grand jury's decision to return indictments, "misperceives the legal requirements regarding materiality. The government need not show that because of the perjured testimony, the grand jury threw in the towel. Actual impediment of the investigation is not required. . . . Grand jurors are capable of judging credibility and they are free to disbelieve a witness and persevere in an investigation without immunizing a perjurer." *United States* v. *Abrams*, 568 F.2d 411, 421 (5th Cir.), cert. denied, 437 U.S. 903 (1978).

The argument that false testimony must actually impede or otherwise influence the grand jury's investigation has been almost universally rejected. The proper "test of relevancy and materiality is not whether the false testimony did in fact influence a pertinent determination. Instead, it must be decided whether, viewed objectively, the testimony directly or circumstantially had a reasonable and natural tendency to do so." *Commonwealth* v. *Giles, supra* at 111. *Commonwealth* v. *Cerveny, supra*. See *United States* v. *Richardson*, 596 F.2d 157, 165 (6th Cir. 1979); *United States* v. *Beer*, 518 F.2d 168, 172 (5th Cir. 1975); *United States* v. *Gugliaro*, 501 F.2d 68, 71 (2d Cir. 1974); *United States* v. *Devitt*, 499 F.2d 135, 139 (7th Cir. 1974), cert. denied, 421 U.S. 975 (1975); *United States* v. *Masters*, 484 F.2d 1251, 1254 (10th Cir. 1973); *United States* v. *Lococo*, 450 F.2d 1196, 1199 (9th Cir. 1971), cert. denied, 406 U.S. 945 (1972). See also *State* v. *Watkins*, 92 N.M. 470, 474-475 (Ct. App. 1979). Cf. *United States* v. *Demauro*, 581 F.2d 50, 53 n.1 (2d Cir. 1978) (more stringent view of materiality applied in SEC proceedings may not apply "in the context of a grand jury investigation").

Clearly, the questions asked of Borans before the grand jury related directly to the subject matter of the grand jury's investigation — political corruption in the city of Revere involving kickbacks to public officials in Revere. Borans'

answers to these questions would have a natural tendency to affect the grand jury's determination regardless of the testimony of other witnesses. "The 'natural effect or tendency' obviously flows from an assumption on the part of the speaker that the tribunal will believe what he says. On this basis materiality refers to the connection between the words said only by the accused and the objective of the investigation; other testimony which the grand jury has heard, except as it may tend to delimit the objective of the inquiry, is therefore irrelevant to a determination of materiality. And we think it equally obvious that had appellant's false statements been believed, the natural effect would have been to impede the grand jury's investigation." *United States* v. *Carson*, 464 F.2d 424, 436 (2d Cir.), cert. denied, 409 U.S. 949 (1972). We conclude that Borans' testimony before the grand jury was on a matter material to the issue.

Next the defendant argues that a close examination of Borans' testimony reveals that both the questions asked of him and the answers which he gave were ambiguous and equivocal. Borans points to the fact that he truthfully told the grand jury that he was aware that Sharigian and Martel has purchased fund raising tickets as evidence of a "retraction or clarification" of his previous answer, which "shows that Borans really did not understand what a kick-back in this context was."

However, Borans properly conceded that, in evaluating a witness's answers, "[i]t is also important that the witness's entire testimony be read together to determine whether perjury truly occurred." See *Commonwealth* v. *Giles*, 353 Mass. 1, 11 (1967); *United States* v. *Crippen*, 570 F.2d 535, 537 (5th Cir. 1978), cert. denied, 439 U.S. 1069 (1979). We think this concession fatal to the defendant's claims.

While it is true that Borans admitted before the grand jury his awareness that Sharigian had purchased Reinstein's fund raising tickets, Borans *denied* any knowledge of payments from Sharigian other than for tickets. He also denied that he had spoken with Martel concerning the amount of money paid by Si Associates, and he denied any knowledge

that Sharigian had given money to Tobin.[17] Contrary to Borans' assertion, examination of the transcript of Borans' grand jury testimony reveals that "considered in the context of the entire examination of the defendant, the question[s were] clear and unambiguous," *United States* v. *Crippen, supra,* as were Borans' responses.[18]

Finally, Borans claims that since the Commonwealth held "all of the cards," calling him before the grand jury placed Borans in a dilemma: either give incriminating testimony or perjure himself. Moreover, Borans maintains that we should reverse his conviction of perjury because he was brought before the grand jury for the purpose of trapping him into perjury. Both contentions are specious.

Borans' first argument ignores the fact that he had another option available to him: the assertion of his constitutional privilege against self-incrimination.[19] Assuming that Borans "was indeed a 'putative defendant,' that fact would have no bearing on the validity of a conviction for testifying falsely. . . . [He] was free at every stage to interpose his constitutional privilege against self-incrimination, but perjury was not a permissible option." *United States* v. *Mandujano,* 425 U.S. 564, 583-584 (1976). See *United*

---

[17] Borans' argument is directed only to assertions of ambiguity and equivocation in the interrogation. He does not deny that, in addition to other evidence adduced at trial, Martel's testimony directly contradicted Borans' responses before the grand jury. Conflicting evidence is for the trier of fact. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 377 (1978).

[18] Similarly, there is no merit to Borans' assertion that he did not understand the term "kick-back." Many of the questions put to Borans did not depend on the use of the term. Moreover, even in the unlikely event that Borans — a city purchasing agent and a former high school teacher — had never heard the term "kick-back" prior to his testimony, the prosecutor's rephrasing of questions gave Borans sufficient indication of the meaning and connotation of the term. "The words used were to be understood in their common sense, not as they might be warped by sophistry or twisted in pilpul." *United States* v. *Crippen,* 570 F.2d 535, 537 (5th Cir. 1978), cert. denied, 439 U.S. 1069 (1979).

[19] At the outset of Borans' testimony before the grand jury, Borans was informed that he was a suspect and he was informed of his constitutional rights. At that point, Borans could have claimed his privilege against self-incrimination. He chose to testify.

*States* v. *Wong,* 431 U.S. 174, 177-178 (1977); *United States* v. *Edelson,* 581 F.2d 1290, 1292 (7th Cir. 1978), cert. denied, 440 U.S. 908 (1979) ("target" status of a witness is no excuse for perjury).

Borans' suggestion that he was somehow "trapped" into perjury is also without merit. "[T]he prosecutor's questioning was not a trap to support a prosecution for perjury. The subject matter of the meeting should have made it memorable, and the prosecutor's repetition and restatement provided ample cues to stimulate defendant's recollection. . . . If indeed a trap was set, it was aimed not at perjury, but at flushing out the truth." *People* v. *Pomerantz,* 46 N.Y.2d 240, 243 (1978).

We agree with the judge that the Commonwealth presented ample evidence to warrant the submission of the charge of perjury to the jury. Accordingly, the defendant's motion for a directed verdict of acquittal was properly denied.

B. *Subornation of Perjury.*

Borans was convicted of subornation of perjury in connection with the testimony of Jack Stone before the grand jury on July 13 and July 15, 1976. See G. L. c. 268, § 2. Borans argues that the judge should have directed a verdict of acquittal on the indictment charging him with subornation of perjury because: (1) Stone retracted his perjured testimony; and (2) Borans merely "counseled Stone to 'stick to the story' that he had done the work" for Si Associates.[20] We think the judge correctly denied Borans' motion.

Borans argues that he cannot be convicted of subornation of perjury because Stone subsequently retracted his perjured testimony before the grand jury. According to Borans,

---

[20] Borans also argues that Stone's testimony was not "material" to the grand jury investigation because it had no actual effect on the grand jury's deliberations. The argument does no more than repeat the argument which Borans makes in connection with Borans' own testimony. We have previously discussed Borans' misconception of the requirement of materiality in some detail. See *supra* at 135-137. We need not repeat it here.

Stone's "subsequent voluntary appearance before the Grand Jury wherein he recanted his previous misstatements while the Grand Jury was still considering the Revere High School matter, is sufficient to insulate him [Stone] from a perjury conviction."

The short answer to Borans' argument is that the argument is factually inaccurate. Stone did not recant his testimony before the grand jury concerning the issue of whether Stone had actually performed three thousand dollars' worth of services for Si Associates. Indeed, subsequent to Stone's testimony before the grand jury he was indicted for perjury.[21] Far from being "insulate[d] . . . from a perjury conviction," Stone ultimately pleaded guilty to the charge.[22] Thus Borans' argument concerning Stone's alleged recantation of his perjured testimony cannot prevail.

Finally, Borans asserts that there was insufficient evidence from which the jury could conclude that Borans actually suborned Stone's perjured testimony. On appeal, Borans admits that he "counseled," and "advised," Stone to "stick to the story" but claims that such evidence is insufficient to support a conviction for subornation of perjury.

In *Commonwealth* v. *Douglass*, 5 Met. 241, 245 (1842), we indicated that "[t]o constitute subornation of perjury, the party charged must have procured the commission of

---

[21] On July 13, 1976, Stone testified before the grand jury that he knew Robert Tobin and that Tobin had done work for him (Stone) in the past. On July 15, 1976, Stone recanted *this* testimony before the grand jury. However, the indictment charging Borans with subornation of perjury relates solely to Stone's testimony concerning services performed by Stone for Si Associates. Stone repeatedly and unequivocally stated in his testimony on July 15 that he had performed at least $3,000 worth of services for Si Associates. The defendant's argument, extensively addressed in his brief on appeal, thus is at best a serious misunderstanding and at worst a misrepresentation of the facts in this case. While we recognize that the trial transcript is approximately 3,000 pages long, we cannot ignore the significant number of factual inaccuracies contained in the defendant's brief. See generally S.J.C. Rule 3:22, DR 7-102(A)(5), 359 Mass. 818 (1972).

[22] Stone had not been sentenced at the time of Borans' trial. This fact was brought to the attention of the jury.

the perjury, by inciting, instigating, or persuading the guilty party to commit the crime." We concluded that there must be "solicitation on the part of the defendant."

We need not decide whether a course of action which involves only "the suggestion of a course of perjury," however reprehensible, would support a conviction for subornation of perjury under G. L. c. 268, § 2. Here, Borans' "counselling" extended well within the range of persuasion, and we are not required to draw such a fine line.

Stone testified that Borans repeatedly told him that if he would "stick to the story," Stone would not be in trouble. On the day before Stone perjured himself, Stone met with Borans at Borans' office. Borans told Stone to "stick to the story, that you did consulting work for Si Associates and there'll be no problems and there is nothing to worry about." Moreover, Borans *also* told Stone that Sharigian would corroborate Stone's false testimony.

These facts are sufficient to warrant the jury in finding that Borans actually procured Stone's perjury by persuading him to testify falsely before the grand jury. See *Commonwealth* v. *Fine*, 321 Mass. 299, 301 (1947) (defendant advised witness to "stick to . . . [his] story" and "you are all right"). There was no error in the denial of the defendant's motion.

C. *Violations of G. L. c. 268A, § 2(b).*

Borans was charged with six violations of G. L. c. 268A, § 2(b).[23] Two of the indictments involve Borans' accept-

---

[23] General Laws c. 268A, § 2, as amended through St. 1964, c. 287, provides in pertinent part: "(b) Whoever, being a state, county or municipal employee . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for

(1) being influenced in his performance of any official act or any act within his official responsibility, or

(2) being influenced to commit or aid in committing, or to collude in, or allow any fraud, or make opportunity for the commission of any fraud, on the commonwealth or on a state, county or municipal agency, or

(3) being induced to do or omit to do any acts in violation of his official duty; . . .

(d) . . . shall be punished by a fine of not more than five thousand dollars or by imprisonment in the state prison for not more than three

ance of payments for Reinstein from Martel. The remaining four indictments involve the vendor kickbacks: three arise out of the kickbacks made by the R.G. Shiers Company; one arises out of the kickback made by Smith Associates. We think that the judge properly denied Borans' motions for directed verdicts of acquittal on each of the six charges.

As to the payments made by Martel, Borans admits that he accepted two cash payments totalling $1,500 for Reinstein. Borans' sole argument on appeal is that since the $1,500 was ostensibly directed toward the purchase of "tickets to a Reinstein fundraiser . . . [and] that it was to cover [earlier] bad checks for the tickets . . . there is no indication that he [Borans] knew the $800 and $700 payments were anything other than legitimate campaign contributions."[24] We disagree.

The jury could have found that, at the time Borans accepted two cash payments for Reinstein from Martel, Borans was aware of the fact that these payments constituted the final instalment of Sharigian's kickback agreement. See supra at 125-126. The jury could also have found that Borans was aware of and actively participated in the kickback scheme by conditioning his approval of the issuance of city checks to Si Associates on the receipt of kickback payments from Martel. Campaign contributions to induce public officials promptly to perform their duties are unlawful. Nor can public officials condition the disbursement of government funds on the receipt of "campaign contributions." See generally Commonwealth v. Kelley, 359 Mass. 77, 89-90 (1971). There was ample evidence from

years or in a jail or house of correction for not more than two and one half years, or by both such fine and imprisonment in a jail or house of correction; and in the event of final conviction shall be incapable of holding any office of honor, trust or profit under the commonwealth or under any state, county or municipal agency."

[24] While the jury could have accepted Borans' explanation of his receipt of the money from Martel and disbelieved the Commonwealth's witnesses, they were not required to do so. See, e.g., Commonwealth v. Clark, 378 Mass. 392, 406 n.15 (1979).

which the jury could find that Borans violated G. L. c. 268A, § 2(*b*) in his acceptance of $1,500 from Martel.

Similarly, the evidence of Borans' participation in the scheme to solicit kickbacks from vendors was sufficient to allow the jury to decide the question of Borans' guilt. As to Shiers, Borans' involvement in the kickback scheme was continuous and active. After Shiers made a $5,000 kickback arrangement with Sharigian, and before Shiers submitted bids to the city of Revere, Borans personally informed Shiers that he (Borans) had spoken with Reinstein and the $5,000 kickback would be "acceptable." Moreover, after Shiers' firm failed to submit a timely bid on one of the contracts and was not the low bidder on the other contract, Borans indicated that he would see to it that the city awarded Shiers the contracts in any event because "Dick [Shiers] had agreed originally to throw back twenty-five hundred on each [contract]." Finally, after Shiers was awarded the two contracts, Borans repeatedly insisted that Shiers complete his kickback payments.

As to the vendor kickback from Smith Associates, the evidence indicates that Smith Associates was to increase its price as an accommodation to Revere officials and to remit the increase to the mayor's campaign treasury. Thus the firm was used as a conduit through which the illegal kickbacks were to be made.

Borans approved the change orders from which the Smith Associates' kickback was to be paid. Further, when Davidson telephoned Borans in late 1974 to complain that Smith Associates had not yet received payment from the city, Borans inquired about the $2,700 kickback promised by Smith Associates.

Borans argues that he never personally "received anything of value from any of the vendors." He also maintains that he was never influenced in the performance of his official duty by the fact that a vendor had agreed to make a kickback payment.

However, G. L. c. 268A, § 2(*b*), does not require that a public officer *personally* receive anything of value. It is

sufficient that the public officer "asks, demands, exacts, solicits [or] seeks," something of value on behalf of another. See note 23, *supra*. We think that there was sufficient evidence from which the jury could reasonably conclude not only that Borans was aware of the vendor kickback scheme, but also that with regard to the kickbacks from Shiers and from Smith Associates he "committed *overt* acts in furtherance" of the scheme (emphasis in original). See *Commonwealth v. Beneficial Fin. Co.*, 360 Mass. 188, 353 (1971), cert. denied sub nom. *Farrell v. Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co. v. Massachusetts*, 407 U.S. 914 (1972). See also *Commonwealth v. Beal*, 314 Mass. 210, 222-224 (1943).

D. *Larceny*.

Borans was charged with larceny in connection with the second $5,000 kickback payment made by Shiers — which was accomplished by reducing the amount of a change order credit filed with the city from $7,650 to $2,650. Borans claimed that "the transcript fails to produce any evidence of Borans' knowledge and intentional participation in the scheme." On the contrary, there was evidence from which the jury could conclude that at the time Borans approved the change order, he knew and intended that by approving a change order credit of only $2,650, $5,000 of the city's money was not a payment for services rendered to the city of Revere, but was to be a kickback to the mayor's campaign treasury. Finally, two days after Borans approved the change order he (Borans) told Shiers "to complete the ten-thousand-dollar kickback."

The submission of the amended change order constitutes a false presentation of a bill for labor and materials sufficient to support a conviction of larceny by false pretenses. See *Commonwealth v. Abbott Eng'r, Inc.*, 351 Mass. 568, 572, 579 (1967); *Commonwealth v. Louis Constr. Co.*, 343 Mass. 600, 604 (1962).

E. *Accessory After the Fact*.

Borans does not argue specifically that the judge's denial of his motion for a directed verdict on the indictment charg-

ing Borans as an accessory after the fact was erroneous.[25] Thus this assignment of error is deemed waived. See, e.g., *Commonwealth v. Napolitano*, 378 Mass. 599, 600 n.2 (1979); *Commonwealth v. Amazeen*, 375 Mass. 73, 74 n.1 (1978). In any event, the evidence outlined in the summary of facts, *supra*, when considered in its light most favorable to the Commonwealth, is more than sufficient to permit the jury to conclude that Borans was guilty as an accessory after the fact to a felony in connection with Sharigian's $25,000 kickback payment to Reinstein.

II. *Evidence of Conversations.*

During the trial, the Commonwealth sought to introduce as evidence various conversations involving Reinstein and others at which Borans was not present. The judge ruled that the testimony was admissible under either of two theories: (1) that Borans was involved in a joint criminal enterprise with Reinstein and others; and (2) that Borans was charged with being an accessory after the fact to a felony committed by Reinstein. Borans maintains that "[n]either of the two justifications offered . . . for the admissibility of this hearsay evidence stands up under close scrutiny."[26] We disagree.

---

[25] Borans' references to the crime of being an accessory after the fact are directed *solely* to the question whether certain conversations occurring in Borans' absence were admissible. See *infra* at 145-148.

[26] Borans also appears to argue that the judge was required to make a preliminary finding that a joint criminal enterprise existed as a precondition to his admission of the evidence concerning the conversations. However, we have indicated that, especially in a case where the evidence tends to be complicated, it is permissible for a judge to admit declarations of coconspirators on the representation of the prosecution that the Commonwealth will subsequently introduce sufficient evidence to show that the defendant was part of the conspiracy. *Commonwealth v. Kiernan*, 348 Mass. 29, 56-58 (1964), cert. denied sub nom. *Gordon v. Massachusetts*, 380 U.S. 913 (1965). Then, "if the evidence fell short of the representations made by the prosecutor," the defendant may properly move to strike the testimony. *Id.* at 57. See, e.g., *Commonwealth v. Dominico*, 1 Mass. App. Ct. 693, 717-718 (1974); *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978); *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir.), cert. denied, 439 U.S. 981 (1978); *United States*

Borans' initial objection is directed to the judge's decision to admit evidence of conversations involving Reinstein and Turiello and Reinstein and the Worcester contractor which occurred prior to the date on which Sharigian was initially solicited for a kickback. According to Borans, these early conversations, relating to kickback solicitations of Turiello and the Worcester contractor, occurred prior to the commencement of any joint criminal enterprise to solicit a kickback from Sharigian and have no relevance to the crimes for which Borans is charged.

It is well settled that, to be admissible against a defendant, the out-of-court statements of coconspirators or joint criminal venturers must have been made during the pendency of the criminal enterprise and in furtherance of it. See, e.g., *Commonwealth v. White*, 370 Mass. 703, 708-709 (1976); *Commonwealth v. Flynn*, 362 Mass. 455, 477 (1972) ("the same general rule of evidence applies to cases where a conspiracy or common enterprise is shown to exist even though not charged"). However, "[t]he relation of parties charged with conspiracy is not an immaterial matter, and,

v. *Graham*, 548 F.2d 1302, 1308 (8th Cir. 1977); *United States* v. *Williams*, 529 F.2d 557, 559 (8th Cir.), cert. denied, 426 U.S. 908 (1976). Accord, *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 312-314 (1922). Cf. *United States* v. *James*, 590 F.2d 575, 581-582 (5th Cir.), cert. denied, 442 U.S. 917 (1979). See generally P. Marcus, Prosecution and Defense of Criminal Conspiracy Cases, § 5.05[3] [b] (1978) ("Should the prosecution not establish the existence of the conspiracy to the trial court's satisfaction, the defense could either move to strike the declarations, or move for a mistrial"). Moreover, here the judge repeatedly gave "cautionary instruction[s] at the time of admission of the proof, with further instructions in the final charge, explaining the conditions to be met before such evidence may be considered." *United States* v. *Krohn*, 573 F.2d 1382, 1387 & n.5 (10th Cir.), cert. denied sub nom. *Hahn* v. *United States*, 436 U.S. 949 (1978). The judge's denial of the defendant's motion to strike the testimony, coupled with the denial of the defendant's motions for directed verdicts, demonstrates that the judge found that the Commonwealth had presented sufficient evidence of the defendant's participation in the schemes. The judge properly did not disclose this ruling to the jury because, as the judge later instructed the jury, the jury were required "to consider the same questions to determine whether it should make the findings which the judge concluded were warranted." *Commonwealth* v. *Beckett*, 373 Mass. 329, 337 n.3 (1977). There was no error.

unless too remote, acts and transactions prior to the alleged date of the commencement of the conspiracy are relevant. The date when a conspiracy is alleged to have begun is not, in effect, a wall behind which the court and jury may never look for the purpose of discovering facts that have a bearing upon the fact of the conspiracy itself." *Commonwealth* v. *Beal*, 314 Mass. 210, 227 (1943). See *Commonwealth* v. *Wampler*, 369 Mass. 121, 123 (1975); *Commonwealth* v. *Stasiun*, 349 Mass. 38, 50 (1965).

The conversations between Reinstein and Turiello, commencing the month after Reinstein took office as mayor of Revere, tended to show that from the outset of Reinstein's administration, Reinstein planned to solicit a kickback payment from the person who held the contract as specifier for the interior design and furnishings of the new Revere high school. When Turiello failed to cooperate, a replacement was sought. The Worcester contractor was solicited for the position. During a meeting at which Borans was present, Reinstein informed the contractor that in order to obtain the contract as specifier for the new high school, the contractor would be required to pay Reinstein $10,000 in cash.[27] After the contractor failed to respond, a search for a "suitable" contractor was undertaken and the successful solicitation of Sharigian commenced.

"[T]he government had a right to show the whole history of the conspiracy from its commencement to its consummation. . . . [The evidence] tended to show the preparations made by [the principal] and the beginning and development of his scheme. It was like the evidence which always has been held to be competent that one charged with a crime had made preparations for its commission, or had by word or deed manifested an intention to commit that crime." *Commonwealth* v. *Stuart*, 207 Mass. 563, 570 (1911). See *Commonwealth* v. *Butynski*, 339 Mass. 151, 152 (1959) ("The consistency of the . . . conduct . . . tended to

---

[27] Since Borans attended this meeting, Borans has not objected to the admission of Reinstein's statement on this basis.

show . . . relevant background . . . [and] that it was part of a general purpose and course of operations"); *Commonwealth* v. *Farmer*, 218 Mass. 507, 512-513 (1914). Accord, *Commonwealth* v. *Eagan*, 357 Mass. 585, 589 (1970) ("the mere fact that evidence tends to prove the commission of some other crime does not render it inadmissible as long as it is relevant to the crime being tried").

In any event, the conversations to which Borans objects are also admissible to show that Borans was the accessory after the fact to a felony. "[T]o convict him, it was necessary to prove beyond a reasonable doubt that . . . the alleged principal . . . was guilty." *Commonwealth* v. *Reynolds*, 338 Mass. 130, 135 (1958). See *Commonwealth* v. *Eagan*, *supra* at 590; *Commonwealth* v. *Tilley*, 327 Mass. 540, 546 (1951). Thus evidence relevant to show the actual commission of a felony by Reinstein,[28] including his preparations therefor, are admissible against Borans, who is charged as accessory after the fact to Reinstein's felony.[29] Accord, *Commonwealth* v. *Eagan*, *supra* at 589-590.

---

[28]As to conversations involving Turiello, the Worcester contractor and Sharigian (in the initial stages of the kickback solicitation), Borans concedes that "[h]ad Reinstein been on trial, this evidence might, arguably, have been relevant as to him."

[29]The defendant relies on *Commonwealth* v. *Perry*, 357 Mass. 149 (1970), and *Commonwealth* v. *Fancy*, 349 Mass. 196 (1965), to support his claim that the evidence is not relevant to the charge that Borans is an accessory after the fact. However, in neither *Perry* nor *Fancy* was the defendant charged with being an accessory after the fact to a felony. Moreover, we reversed convictions in both cases on the ground that the defendant's association with felons, "without more, is not enough to convict the defendant." *Commonwealth* v. *Perry*, *supra* at 151. *Commonwealth* v. *Fancy*, *supra* at 200. The question in each case was *not* whether the defendant's association with the principal felons was admissible — which it was — but whether that evidence, standing alone, would support a conviction. See also *Commonwealth* v. *Devlin*, 366 Mass. 132, 136 (1974) (Commonwealth must show defendant's knowledge of felony). We are adamant that guilt by association is insufficient to support a conviction. In this case, however, the evidence of Borans' guilt by his participation in the unlawful schemes is overwhelming.

III. *Other Issues.*

A. *Motion to Sever.*

The defendant contends that he was entitled to three trials: one involving the Sharigian kickback, a second concerning the vendor kickbacks, and a third on the indictment charging him with perjury. Thus he asserts that the judge's denial of his motion to sever was error. However, the judge's decision to deny the motion to sever "was for him to make as matter of discretion, and we reverse him only if there has been 'a clear abuse of discretion.' " *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 233 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts,* 407 U.S. 910 and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U.S. 914 (1972). See, e.g., *Commonwealth* v. *Cruz,* 373 Mass. 676, 690 (1977); *Commonwealth* v. *Iannello,* 344 Mass. 723, 727-728 (1962).[30] "The question in each case is simply whether 'the separate offences would be proved by "evidence connected with a single line of conduct, and grow out of what is essentially one transaction." ' " *Commonwealth* v. *Cruz, supra* at 690, quoting from *Commonwealth* v. *Maloney,* 348 Mass. 610, 614 (1965). See *Commonwealth* v. *Rosenthal,* 211 Mass. 50, 54 (1912) ("No sound reason can be given why several indictments charging different crimes arising out of a single chain of circumstances should not be tried together"). Here, the judge could reasonably have concluded that the indictments all resulted from the construction of the new Revere high school, and that separate trials were neither required nor warranted.[31] See *Commonwealth* v. *Rosenthal, supra.*

---

[30] The question of joinder is now governed by Mass. R. Crim. P. 9(a)(1) and (3), 378 Mass. 859 (1979): "Two or more offenses are related offenses if they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan. . . . If a defendant is charged with two or more related offenses, either party may move for joinder of such charges. The trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice."

[31] The Commonwealth properly points out that both Federal cases upon which the defendant relies to support his assertion that the trial of the

B. *The Scope of Cross-Examination.*

Defense counsel sought to ask the Commonwealth's witnesses (Martel, Sharigian, Bowden, Davidson) whether they were aware of the maximum penalties for crimes for which they either had been or could be charged. When the Commonwealth objected,[32] the judge ruled that the defense counsel "may ask him if he was informed of the penalties attached to the particular crimes of which he was informed he was a suspect and not what the years would be or what the Court might do as far as the penalty is concerned." This procedure was followed with regard to Bowden and Davidson.

In *Commonwealth* v. *Dougan*, 377 Mass. 303 (1979), we indicated that while "[t]he defendants are entitled, as of right, to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government . . . , the trial judge still has discretion to control the scope of the examination." *Id.* at 310. Here, especially since many of the charges against witnesses were similar to those faced by the defendant, we find no abuse of the judge's discretion. Indeed, the judge allowed the defendant considerable latitude in questioning witnesses as to the crimes for which they could be or had been charged and, in Bowden's case, that Bowden was testifying under a grant of immuni-

---

perjury indictment should have been severed held that there was no error in the judges' denial of motions to sever perjury indictments from indictments for substantive offenses. See *United States* v. *Pacente*, 503 F.2d 543, 545-547 (7th Cir.), cert. denied, 419 U.S. 1048 (1974); *United States* v. *Sweig*, 441 F.2d 114, 118-119 (2d Cir.), cert. denied, 403 U.S. 932 (1971). See also *United States* v. *Jamar*, 561 F.2d 1103, 1106-1107 (4th Cir. 1977); *United States* v. *Hilliard*, 436 F.Supp. 66, 72-75 (S.D.N.Y. 1977).

[32] One of the Commonwealth's first objections to a question concerning a maximum penalty was grounded in the fact that defense counsel had misstated a maximum penalty. The judge then informed defense counsel that "I am going to ask you to ask the witness if he was informed as to the punishment of the crime. Not a recitation as to what the penalty is, because I do not intend to check the statute book each time to find if you are accurate."

ty. The defendant's right to reasonable cross-examination of witnesses "is not necessarily infringed by curbing inquiry where the matters sought to be elicited have been sufficiently brought to the attention of the trier of fact through other questioning or other means." *Commonwealth* v. *Walker*, 370 Mass. 548, 572, cert. denied, 429 U.S. 943 (1976).

C. *Notes of Interviews with Commonwealth Witnesses.*

The defendant asserts that the judge erred in refusing to require the assistant district attorney to turn over notes made by the assistant district attorney and his investigators relating to Commonwealth witnesses. According to the defendant, he is entitled to inspect these materials pursuant to our holding in *Commonwealth* v. *Lewinski*, 367 Mass. 889, 901-903 (1975). See also Mass. R. Crim. P. 14 and 23, 378 Mass. 874 and 893 (1979).

In *Lewinski*, we indicated that a defendant may, without a showing of "particularized need," move to inspect all "prior written statements of prosecution witnesses which are available to the prosecution and are related to the subject matter of their testimony at trial." *Id.* at 902. However, we also indicated that the prosecution need disclose only "any statement made by the witness and in some definite way approved by him, a transcript of a contemporaneous verbatim or substantially verbatim stenographic or other recording of an oral statement by the witness, and a written report consisting of a statement by the witness." *Id.*

Here, the defense counsel moved for production of such materials at the conclusion of the direct examination of each of the principal prosecution witnesses. On each occasion, the assistant district attorney represented to the court that the Commonwealth had already given to the defendant all transcripts of grand jury minutes, all depositions and all witness statement summaries which had been approved or adopted by the witness.[33] The assistant district attorney

---

[33] On appeal, counsel for the defendant implies that the adopted statements of certain witnesses turned over to the defendant prior to trial were unfairly incomplete. For example, he asserts that while the testi-

further represented to the judge that the only materials which the Commonwealth had not turned over to defense counsel consisted of notes made by the prosecutor or his investigators which had never been adopted by witnesses and which constituted the prosecutor's work product. The judge refused to compel the assistant district attorney to reveal these materials to the defendant.[34]

On the record before us, we cannot say that the judge's refusal to compel production of these materials was error. While the defendant's trial counsel cross-examined the principal witnesses extensively, and while this cross-examination included discussion of the witnesses' meetings with the Commonwealth's investigators, we are unable to find in the record the slightest support for a claim that the Commonwealth was in possession of a statement adopted by any witness which had not been turned over to the defendant or that the Commonwealth's representations were made in bad faith.[35]  Compare *Goldberg* v. *United States*, 425 U.S.

---

mony of Sharigian and Martel encompassed seven trial days, the defendant viewed only "a nine page statement drawn up by Mr. McNally and affirmed by the witnesses" and the witnesses' grand jury testimony. The Commonwealth denies this claim, and notes that as to Sharigian the defendant received two adopted statements, totalling seventy-two typewritten, single-spaced pages.  As to Martel, the defendant received a fifty-four page, single-spaced, typewritten statement.  The record substantiates the Commonwealth's position.  See also note 21, *supra*.

[34] In each case, the judge refused to make a formal ruling, taking the position that he was refusing to compel production of the documents and that *Commonwealth* v. *Lewinski*, 367 Mass. 889 (1975), did not require a judge to make a formal ruling. He stated to defense counsel that the assistant district attorney "was very explicit in that you were provided everything he has and I do not think it is required. I will note your exception."  While a formal denial of the defendant's motion might have been preferable, it is clear from the record that the judge denied the defendant's motion by his "refusal to make an order" compelling the Commonwealth to turn over the materials.

[35] The record reveals that extensive statements adopted by virtually every principal prosecution witness were turned over to the defendant prior to trial. See, e.g., note 33, *supra*.  Further, in the case of Shiers, the assistant district attorney offered to turn over certain mathematical computations, and figures which he had discussed with Shiers just prior to

94, 100-101, 105-106 (1976) ("work-product doctrine") does not preclude discovery where witness had "adopted or approved" a writing containing trial strategy). Moreover, contrary to the defendant's assertions on appeal, the defendant never requested that the judge examine the prosecutor's notes in camera, and the defendant never requested that the notes in question "be identified so that in case of conviction and appeal it may be sealed and transmitted to the reviewing court." *Commonwealth* v. *Lewinski, supra* at 903.[36] The defendant "as the appealing party has the burden of showing in the record by agreement if possible, otherwise by evidence, the existence of the records he contends were wrongfully denied him." *Commonwealth* v. *Hall,* 369 Mass. 715, 724 (1976). The prosecutor has a continuing duty promptly to disclose to the defendant's counsel any changes of substance in the statements of prospective witnesses of which the prosecutor becomes aware. See Mass. R. Crim. P. 14(a)(4); *Commonwealth* v. *Gilbert,* 377 Mass. 887, 894 (1979). There is nothing in the record to show misconduct by the prosecutor or that the prosecutor withheld materials from the defense which should have been dis-

---

trial. The assistant district attorney had earlier given to the defense a statement adopted by Shiers and the transcript of a prior inconsistent tape-recorded statement.

[36] The defendant asserts that "the Court did make the discovery allowed part of the record, but refused to make the additional testimony requested at trial (and not made available) part of the record." The page reference to the transcript cited in the defendant's brief is to a bench conference during which the defendant's trial counsel requested that copies be made of the statements of witnesses which the Commonwealth had already turned over to the defendant. Defense counsel also requested that these statements be made a part of the record. When the judge and the assistant district attorney pointed out that the statements were already a part of the record, the defendant's counsel responded that "I had forgotten those were in evidence." We were unable to find an instance in which the judge denied a request to make the additional materials a part of the record. Apparently, the judge was never asked to make any additional materials a part of the record.

closed.[37]  Cf.  *Commonwealth* v. *Ellison*, 376 Mass. 1, 20-27 (1978).  We find no error in the judge's denial of the defendant's motions.

*Judgments affirmed.*

---

[37] The defendant makes much of the fact that, as to Stone, the assistant district attorney stated that he had no notes of any interviews conducted prior to Stone's perjurious testimony before the grand jury.  However, the defense was given a copy of Stone's grand jury testimony.  The defense was also given a subsequent statement adopted by Stone wherein Stone stated that in earlier interviews with the assistant district attorney Stone had "stuck to [the] story" which he later gave to the grand jury.  During Stone's testimony at trial, he freely admitted that he had originally told a different story to investigators and before the grand jury.  These "prior inconsistent statements" resulted in Stone's conviction of perjury, a fact which was fully brought to the attention of the jury by the Commonwealth as well as by the defendant.