## Commonwealth vs. Leonard J. Soares.

Barnstable. Mây 6, 1981. — July 27, 1981.

Present: Hennessey, C.J., Wilkins, Abrams, Nolan, & Lynch, JJ.

*Constitutional Law*, Search and seizure. *Search and Seizure*, Warrant.
*Conspiracy*. *Evidence*, Relevancy and materiality, Common criminal
enterprise.

Discussion of the permissibility of "anticipatory warrants" under the
Fourth Amendment to the Federal Constitution. [153-154]

Under G. L. c. 276, § 1, a search warrant may issue on a showing that
concealment or possession of described property on certain premises is
probable at the time the warrant is to be executed, and not solely at the
time of its issuance. [154-155]

A warrant for the search of certain premises, describing with particularity
an undelivered package as the object of the search, was not invalid for
its failure to give the executing officers directions to search only after
the package had been delivered to the premises, where the issuing
magistrate had been informed by affidavit that the package was sub-
ject to the control of law enforcement personnel and that delivery of
the package and the search would follow without delay upon the is-
suance of the warrant. [155]

Evidence at the trial of an indictment charging conspiracy supported the
judge's threshold determination that the Commonwealth had estab-
lished a sufficient foundation for the admission against the defendant
of extrajudicial statements of a coconspirator. [156-162]

INDICTMENT found and returned in the Superior Court
Department on July 15, 1980.

A pretrial motion to suppress evidence was heard by
*Mone*, J., and the case was tried before him.

After review was sought in the Appeals Court, the
Supreme Judicial Court ordered direct appellate review on
its own initiative.

*Frederick C. Mycock* for the defendant.

*Gary A. Nickerson*, Assistant District Attorney, for the
Commonwealth.

NOLAN, J.   On July 15, 1980, a Barnstable County grand jury returned an indictment charging the defendant with conspiring, between August 1, 1979, and January 17, 1980, to distribute unlawfully a Class B controlled substance, methamphetamine, in violation of G. L. c. 94C, § 40.[1] Named as coconspirators were Tracey L. Ellis, a Massachusetts resident, and Wade A. Richter, Russell Wathey, and Carol Wathey, all of California.   The defendant was convicted after a three-day jury trial.   He appealed and we transferred the case to this court on our own motion.   See G. L. c. 211A, § 10 (A).

The issues raised are essentially two.   The defendant initially challenges the denial of his motion to suppress all evidence seized on January 16, 1980, in the course of two subsequent searches of a residence he shared with Tracey Ellis.[2]   He argues that the first search was pursuant to an "anticipatory" warrant, invalid under G. L. c. 276, § 1, and that because probable cause for the second warrant was derived entirely from observations made during the first search, it too was fatally defective.   Turning to his trial, the defendant asserts that thirteen separate exhibits, and testimony related to them, were erroneously received in evidence.   These errors, he claims, led the trial judge to rule incorrectly that the Commonwealth had made a prima facie showing of his participation in the conspiracy alleged, and thus led to the admission of a named coconspirator's extrajudicial statements implicating the defendant in the

---

[1] The defendant was also indicted for possession of methamphetamine with intent to distribute and possession of other controlled substances in violation of G. L. c. 94C, §§ 32 & 34.   No issue relating to these charges is raised on this appeal.

[2] In connection with the motion to suppress, the defendant filed an affidavit admitting that this residence was his.   At trial, however, the question whether the defendant in fact lived with Tracey Ellis appears to have been controverted.   Although the explanation for this disparity does not appear on the record, it may be inferred that it was due to the suppression at trial of certain admissions made by the defendant during the course of the search of the residence.   For the sake of clarity, we refer to the premises searched as the "Ellis residence."

crime. Because the challenged evidence was essential to the Commonwealth's case, the defendant contends that he was entitled to a required finding of not guilty.

On appeal, he seeks reversal of his conviction and either the entry of a judgment of acquittal or a new trial. We conclude that there was no error requiring reversal in either the denial of the motion to suppress or in the conduct of the trial, and we affirm the defendant's conviction.

1. We consider first the defendant's contention that the warrants authorizing the two searches of the Ellis residence were invalid, and begin by recounting the circumstances surrounding those searches. On January 9, 1980, Trooper Paul F. Gregory, a Massachusetts State police officer assigned to investigation of traffic in narcotics, received word from Detective Louis Perry of the sheriff's office in San Bernardino, California, that a package containing methamphetamine had been deposited at the United Parcel Service (UPS) terminal in San Bernardino for delivery to one Tracey Ellis, 317 Lakeside Drive, Marstons Mills, Massachusetts. The suspicions of the desk clerk who took the package had been aroused by the nervous and evasive behavior of the customer mailing it, and she had opened it for inspection as permitted by UPS regulations. Upon discovering that it contained a white powdery substance in a cellophane bag, she notified her supervisor, who in turn called Detective Perry. Perry secured the package, removed a sample of its contents for analysis, and determined that it contained methamphetamine. Retaining the original outer wrapping, Perry repackaged the drug, and initialed both the box and a new outer wrapping. He then copied the original address and return address and mailed the package in care of the UPS supervisor at the North Dartmouth, Massachusetts, terminal.[3] On January 14, 1980, Gregory was advised that the package had arrived at the North Dartmouth terminal and would be shipped to the UPS terminal at Buzzards Bay, from which delivery to the Marstons Mills address would be made.

---

[3] This appeal raises no challenge to any aspect of this search.

On January 16, 1980, Gregory filed an application in Barnstable District Court for a warrant to search the residence in Marstons Mills. In an attached affidavit Gregory recited the facts above and described in detail the premises to be searched and the object of the search. The affidavit concluded with the information that a UPS employee "had the package in hand and was awaiting the arrival of the Search Warrant before delivering to the before mentioned address." An assistant clerk issued the warrant in standard printed form (see G. L. c. 276, § 2A), directing an "immediate" search of the described premises and seizure of the package. Accompanied by six other law enforcement officers, Gregory then went to the neighborhood of the Ellis residence. Upon being advised that the package had been accepted by Tracey Ellis, Gregory went to the Ellis residence, presented her with the warrant, and advised her of her Miranda rights. Ellis immediately led Gregory to a closet in which the unopened package was concealed.

Inside the Ellis residence, Gregory observed a variety of paraphernalia associated with the use of illicit drugs, as well as telephone billing records listing calls to California. He thereupon returned to Barnstable District Court, presented an affidavit detailing these observations, and obtained a warrant authorizing him to search the Ellis residence for, and to seize, "cannibus sativa L aka marijuana, cocaine, Methamphetimine [*sic*], and all paraphernalia used in the ingesting of narcotics and distribution of same, records and telephone numbers also used for the distribution of narcotics." Gregory returned to the Ellis residence and seized a variety of items associated with the use or distribution of illicit drugs. The inventory of property seized is reproduced in the margin.[4]

---

[4] The following is the inventory of the property taken pursuant to the warrant:

"1. $12,090.00 in cash U.S. currency

"2. Brn Btl w/white powder, Clear Bottle white powder, 3 cutting razors white powder, 2 straws 1 metal 1 plastic white powder,

The defendant's motion to suppress all evidence seized in the course of the searches described above was heard and denied on September 22, 1980, immediately prior to his trial. The original motion alleged a variety of defects, both constitutional and statutory, in the warrant authorizing the initial search of the Ellis residence. On appeal, the attack is narrowed to the "anticipatory" nature of that warrant. The defendant asserts that because it was clear from the affidavit offered to establish probable cause that the object of the search was not on the premises to be searched at the time the warrant issued, the authorization to search was beyond the limits set by G. L. c. 276, § 1. In the alternative, the defendant argues that the language of G. L. c. 276, § 1, requires that the issuing magistrate condition the execution of an anticipatory warrant on the occurrence of a future event — here, the delivery of the contraband.

We have not previously addressed the permissibility of anticipatory warrants. The questions raised are not novel, however. There is no constitutional impediment to their use in the circumstances presented by this case. See 1 W.R. LaFave, Search and Seizure § 3.7(c), at 698-704 (1978). Neither logic nor the policies underlying the Fourth Amendment warrant requirement support a general prohibition against the use of anticipatory warrants. First, as to the probative quality of the facts stated to support their issuance, LaFave observes that "as a general proposition the facts put forward to justify issuance of an anticipatory war-

---

21 blue pills, 5 red caps. 2 red/blue caps. 1 yellow pill, 1 red pill, 1 brass pipe, 1 knife

"3. 1 sock containing brn bottle containing white powder

"4. 3 razor blades residue, 1 brass straw residue, 2 roaches, 1 roach clip

"5. 1 plastic baggie containing frn veg mat., 2 packages of zig, zag papers

"6. 1 wooden cylinder containing grn veg. mat.

"7. various recipts [sic] and bills, address books etc.

"8. 1 sargent welch scale color silver

"9. 1 ohaus color tan, red, black, silver scale

"10. 5 photo graph albums."

rant are more likely to establish that probable cause will exist at the time of the search than the typical warrant based solely upon the known prior location of the items to be seized at the place to be searched." W.R. LaFave, *supra* at 701, citing *People* v. *Glen,* 30 N.Y.2d 252, 258-259, cert. denied sub nom. *Baker* v. *New York,* 409 U.S. 849 (1972). This point is demonstrated by the facts of the instant case. The affidavit indicated that the object of the search was subject to the control of law enforcement personnel, and that delivery would occur immediately upon obtaining the search warrant. Second, the goal of encouraging the use of warrants is hardly fostered by requiring that police officers await the actual delivery of known contraband to the premises to be searched, thus putting them to a choice between undertaking an immediate unwarranted search or taking the time to obtain a warrant and risking the destruction or concealment of potential evidence. See *Alvidres* v. *Superior Court,* 12 Cal. App. 3d 575, 581 (1970). Although the Supreme Court has not specifically passed on the question, we note that these considerations have persuaded the great majority of courts which have considered the issue to conclude that the use of anticipatory warrants is constitutional. See *Johnson* v. *State,* 617 P.2d 1117, 1124 (Alas. 1980); W.R. LaFave, *supra* at 698-699 nn. 77 & 78 (collecting earlier cases).

On appeal, the defendant has abandoned the argument that anticipatory warrants are unconstitutional per se; he now argues that G. L. c. 276, § 1, either precludes their use, or, at a minimum, requires that such a warrant explicitly state the conditions under which it may be executed. The first argument is based on a literal reading of the statute, which provides that warrants may issue in criminal cases on a showing of probable cause to believe that defined property or articles, including "property or articles the possession or control of which is unlawful," "are concealed" in the place to be searched. The defendant suggests that this language requires evidence that the object of the search is actually present at the premises to be searched before a warrant may issue. We have already discussed the policy

grounds for rejecting such a rigid interpretation of the statutory language. We think that the essential question under G. L. c. 276, § 1, as under the Fourth Amendment, is whether "the evidence [stated in the affidavit] creates substantial probability that the seizable property will be on the premises when searched." *People* v. *Glen, supra* at 259. In accordance with this standard of probable cause, we read G. L. c. 276, § 1, to permit search warrants to issue on a showing that concealment or possession is probable at the time a warrant is to be executed, and not solely at the time of its issuance. See *Johnson* v. *State, supra.* Cf. *People* v. *Glen, supra* at 261 (statutory requirement that warrants be executed "forthwith" does not preclude issuance of anticipatory warrants). Compare *Gerardi* v. *State*, 307 So.2d 853, 855 (Fla. App. 1975). We are reinforced in our conclusion by the Legislature's explicit disclaimer in G. L. c. 276, § 1, of any intent to impair the powers of search and seizure existing "under the common law."

Finally, we reach the defendant's contention that the initial warrant in this case was invalid for its failure to give the executing officers explicit directions to search only after the package had been delivered. We agree that it is preferable for a magistrate issuing an anticipatory warrant to define with reasonable precision the circumstances which must be present prior to its execution. See *Johnson* v. *State, supra* at 1124 n.11; *People* v. *Glen, supra* at 261-262; *Alvidres* v. *Superior Court, supra* at 582; W.R. LaFave, *supra* at 703. In the instant case, the clerk was informed by the affidavit that delivery of the contraband and the search would follow without delay upon the issuance of the warrant. In these circumstances, the failure to alter the printed direction to execute the warrant "immediately" was not unreasonable, and does not make the search unlawful.

The defendant concedes that the validity of the second warrant and the lawfulness of the search pursuant to it rest entirely on the lawfulness of the first search. We conclude that there was no error in the denial of the motion to suppress as to either search.

2. Before discussing the defendant's challenges to the judge's evidentiary rulings, it is useful to review the substance and the structure of the Commonwealth's case. We start by summarizing the main components of that case, then analyze the evidence in greater detail as required to meet the defendant's specific assignments of error.

The circumstances of the January 16 searches of the Ellis residence were described at the trial by Trooper Paul Gregory. The package in which the contraband was shipped, the white powder it contained, and a laboratory analysis identifying the contents as being methamphetamine were all admitted in evidence. Gregory delineated the circumstances of the second search, including the defendant's presence during it. Two scales found in the Ellis residence capable of measuring weights ranging from grams to pounds were admitted as exhibits. Gregory testified on the basis of his experience and training in the field of narcotics law enforcement that these were typical of scales used in the distribution of illicit drugs. Gregory also identified other items seized during the second search, namely, two telegraphic money order receipts bearing the name of Tracey Ellis as the sender and Russell Wathey as the recipient, and customer copies of telephone bills listing the Watheys' California numbers, as having been found during the second search. He further testified that he had discovered approximately $12,000 in cash in the Ellis residence. A photograph of a part of this money was admitted. Finally, Gregory testified that during the search he found airline tickets bearing the defendant's name, which were admitted as an exhibit, as well as a variety of men's clothing.

Business records of Western Union money order transactions were introduced from two sources. The Western Union agent from Buzzards Bay produced a money order form in the amount of $6,500. The sender was listed as "Leon Soarez, Curtis St., Wareham, MA." The order was payable to "Russell Wathey, 2176 Mallory, San Bernardino, CA." The test question, to be answered by the recipient, was "Greaser." The two money order receipts found in the

Ellis residence, which had been previously marked for identification, were admitted as exhibits simultaneously with this form.

The Commonwealth then called the Western Union district operations manager in charge of the company's Cape Cod office. He produced photostatic copies of company records of three money order transactions. The first of these corresponded to the transaction indicated by the form produced by the Buzzards Bay agent. The second, dated August 8, and in the amount of $4,100, named "Russel Wathui" as the recipient. The sender was identified as "L. Soarez, Box 12, Hyannis Port, MA." The third, dated August 27, for $500, was payable to "Carol Wathey." It identified the sender as "Leon Soares, 398 5 Ave., West Hyannisport, MA." The test questions used in the three transactions were, respectively, "Dog's name Greaser," "Greaser," and "Griser."

Wade Richter, a named coconspirator, testified that he had been acquainted with Russell and Carol Wathey for approximately five years, and that he had associated with them on a daily basis during the period specified in the indictment. In the latter part of December, 1979, he had purchased the methamphetamine destined for delivery to Marstons Mills and had mailed it according to instructions given to him by Russell Wathey. The money for this purchase had been obtained through a Western Union money order. He identified the Watheys' California address as 2176 Mallory Street in Muscoy, a suburb of San Bernardino, and identified two telephone numbers as having been in use by the Watheys during the relevant time period. He further testified that the Watheys' dog was named "Greaser." On direct examination, he stated that he had pleaded guilty in California to a charge of transporting narcotics in connection with his role in the case.

Detective Perry, of the San Bernardino, California, sheriff's office, testified to the circumstances of his initial search of the package in California, and to the preparations he made for the subsequent Massachusetts search. He further

testified that on January 25, 1980, he executed a search warrant at the Wathey residence in Muscoy, California. Four Western Union money order receipts evidencing the payment to Russell Wathey of $6,500 on October 31, 1979, and seized during that search, were received in evidence. A second similar group of four receipts dated September 24, 1979, was also admitted. Finally, two handwritten notes seized at the Wathey residence, the first bearing Ellis's name and Marstons Mills address, the second hearing the notation "Marston Mills, Cape Cod," were produced by Perry and admitted in evidence.

Following Perry's testimony, the Commonwealth requested a bench conference. The prosecutor expressed his intention to recall Wade Richter for the purpose of obtaining testimony relating to conversations between Richter and Russell Wathey which implicated the defendant in the conspiracy alleged. Over the strenuous objections of defense counsel, the judge ruled that the Commonwealth had established the necessary foundation for the admissibility of this evidence, and Richter again took the stand. Richter then testified that in mid-December, 1979, he was told by Wathey to obtain a pound of methamphetamine for resale to the defendant. Wathey told Richter that the drug would be sent to the defendant's Massachusetts residence, but that Tracey Ellis's name would be used as the addressee because of the defendant's concern that he was under police surveillance, and because he believed that, if the package were intercepted, Ellis would be prosecuted in his stead. Later, Wathey notified Richter that the defendant had changed his mind, and wanted to purchase the drug in two installments of half a pound each. After a brief cross-examination by defense counsel, the Commonwealth rested its case. The jury was excused and the defendant moved for a required finding of not guilty, which motion the judge denied.

At trial, the defendant objected to the admission of virtually every exhibit offered by the Commonwealth, on the ground that they were either hearsay or irrelevant. In his brief, the defendant renews his argument that thirteen sep-

arate exhibits were improperly admitted. In sum, the defendant argues that in determining that a foundation had been established for the admission against him of the extrajudicial statements of a coconspirator, the judge relied on evidence that was itself inadmissible. The ultimate contention is that the challenged evidence was essential to the Commonwealth's case, and thus that the defendant's motion for a required finding of not guilty was improperly denied. We disagree. We discuss first the application in this case of the exception to the hearsay rule for the statements of coconspirators. We then turn to the few evidentiary issues remaining.

The defendant concedes that, upon establishing a proper foundation, the statement of one coconspirator made during the course of the conspiracy and in furtherance of it is admissible against other conspirators despite their absence at the time of the statement. *Commonwealth* v. *Beckett*, 373 Mass. 329, 338-339 (1977). *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). The contention here is that the necessary foundation was lacking. The foundation rule has both substantive and procedural dimensions. The ultimate question is whether the whole evidence is sufficient to warrant an inference that a conspiracy existed, and that both the defendant and the declarant had joined it. *Commonwealth* v. *Beckett, supra* at 337 n.3. "In making this determination, the conspiracy may be, and usually is, proved by circumstantial evidence." *Commonwealth* v. *Stasiun*, 349 Mass. 38, 50 (1965). See Toomey, Some Procedural Aspects of the Prosecution of a Conspiracy in the Commonwealth of Massachusetts, 53 Mass. L.Q. 207, 240 (1968) ("The quantum of circumstantial evidence necessary to make out a *prima facie* conspiracy is that amount of proof which, according to *Commonwealth* v. *Galvin*, 310 Mass. 733, 745 . . . [1942] '. . . [indicates] concerted action toward the accomplishment of a common purpose'"). The threshold determination of this question is for the trial judge; ultimately, however, the jury "must make definite findings on the same questions which the judge must pass on before he may permit the jury to consider whether that evi-

dence may be used against all." *Commonwealth* v. *Beckett, supra* at 340.

In the instant case, there was abundant nonhearsay evidence from which to infer the defendant's participation in the conspiracy alleged. There was strong circumstantial evidence to support the conclusion that the defendant and Ellis shared the Marstons Mills residence.[5] The defendant's arrival at the house in the interim between the two searches, coupled with the discovery of airline tickets bearing his name and articles of men's clothing during the course of the search, was sufficient to warrant the inference that he lived there.[6] While these facts taken cumulatively did not compel the conclusion that the defendant lived in the Ellis residence, proof of that order was not required. "An inference, if not forbidden by some rule of law, need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Beckett, supra* at 341. *Commonwealth* v. *Nelson*, 370 Mass. 192, 200-201 (1976), and cases cited.

The defendant's association with Ellis gave added significance to the initial testimony of Wade Richter. Richter testified that he had purchased the methamphetamine with money transferred by Western Union money orders, and had prepared the package for mailing under the direction of Russell Wathey. Particularly significant was Richter's testimony that the address in Marstons Mills to which the package was mailed had been provided by Russell Wathey.

The testimony was sufficient to link the Western Union business records received in evidence to the other proof of conspiracy. These records consisted of a money order form kept on file at the Buzzards Bay Western Union office, and three reproductions of Western Union's computerized records of substantial sums wired from Cape Cod to the Watheys in California. The defendant concedes that all four documents were properly qualified as business records under G. L. c. 233, § 78, but argues that they were inad-

---

[5] As pointed out in note 2, *supra*, this fact was in controversy at trial.

[6] There is no basis for the defendant's argument that the airline tickets were inadmissible hearsay; they were offered to show the defendant's residence and for no other purpose.

missible on grounds of relevance absent some positive identification of the defendant as the sender. This contention is meritless. Each of the transactions recorded was addressed to either Carol or Russell Wathey in San Bernardino. Each used the code word "Greaser," or some variant thereof, as the test question to be answered by the recipient. In each, the sender's name was a slight variation on the defendant's proper name. These factors went to the weight, rather than to the admissibility, of the evidence. The test of relevance is whether the evidence offered rationally tends to prove the proposition at issue. *Commonwealth* v. *Richmond*, 207 Mass. 240, 245 (1911). "Every piece of evidence by itself does not have to be sufficient to prove the main point at issue. *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 314 [1922]. 'Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts.' *Commonwealth* v. *Mulrey*, 170 Mass. 103, 110 [1898]. *Commonwealth* v. *Coyne*, 228 Mass. 269, 272 [1917]." *Commonwealth* v. *Stasiun*, 349 Mass. 38, 51 (1965). The question whether the defendant was in fact the sender in these transactions was properly for the jury.

The judge's conclusion that the Commonwealth had made a prima facie showing of conspiracy was further supported by certain other evidence discovered in the Ellis residence. In the search of January 16, the police recovered two receipts for Western Union money orders sent by Tracey Ellis to Russell Wathey in California. The two transactions took place on consecutive days in late September, 1979; their total cash value was $6,500. The police also recovered telephone billing records listing long distance calls to numbers identified by Richter as having been used by the Watheys during the course of the conspiracy. The defendant objected to the admission of these documents at trial on the grounds that they were hearsay and irrelevant, and he renews these objections here. While these documents were not properly qualified as business records, and were thus inadmissible as evidence of the transactions re-

corded, they were, nevertheless, admissible as evidence of the relationship between the alleged conspirators. The relationship of the conspirators was material to the Commonwealth's case, and the relevance of these exhibits to that issue is beyond dispute. See *Commonwealth* v. *Borans*, 379 Mass. 117, 146-147 (1979); *Commonwealth* v. *Ellis*, 373 Mass. 1, 8 (1977); *Commonwealth* v. *Cohen*, 6 Mass. App. Ct. 653, 657 (1978). Compare *Commonwealth* v. *Patterson*, 4 Mass. App. Ct. 70, 75-76 (1976). That these exhibits were admissible for a single, limited purpose is enough. See W.B. Leach & P.J. Liacos, Massachusetts Evidence 319 (4th ed. 1967). While limiting instructions might have been requested, they were not, and in the absence of a request, they were not required.

We conclude that sufficient nonhearsay evidence was adduced by the Commonwealth to support a fair inference of the defendant's connection with the conspiracy alleged. *Commonwealth* v. *Kelley*, 359 Mass. 77, 85-86 (1971). Once that showing had been made, Richter's testimony as to Russell Wathey's statements describing the defendant's role in the unlawful scheme was rendered admissible. The defendant does not contend, nor could he, that the evidence including Richter's testimony was insufficient to send the case to the jury. It follows that his motion for a required finding of not guilty was properly denied.

Two evidentiary points remain. Certain Western Union receipts indicating the payment of monies to the Watheys in California were discovered in the search of their home and admitted against the defendant. No foundation was laid for the admission of these documents as business records, nor do they on their face have any relation to the conspiracy alleged. They were, accordingly, inadmissible. However, their effect was merely cumulative, and the error was harmless. The same is true of the two handwritten notes also recovered in the search of the Wathey home. See *Commonwealth* v. *Meech*, 380 Mass. 490, 498 (1980). We therefore affirm the defendant's conviction.

*Judgment affirmed.*