COMMONWEALTH *vs.* JOSEPH E. McLAUGHLIN.

Suffolk. February 7, 2000. - April 14, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Conspiracy. Evidence,* Hearsay, Conspiracy, Operative words, Intent. *Practice, Criminal,* Instructions to jury, Indictment, Dismissal. *Limitations, Statute of. Statute,* Construction.

At the trial of an indictment alleging conspiracy to commit armed assault with intent to murder, evidence of a coconspirator's extrajudicial statement was properly admitted, where independent evidence established beyond a reasonable doubt that the defendant was involved in a conspiracy to kill his wife. [246-247]

At the trial of an indictment for conspiracy to commit armed assault with intent to murder, the judge properly within his discretion determined that the extrajudicial statement of a coconspirator, made over a year before the assault, was not too remote to be relevant. [247-248]

At the trial of a criminal case, the judge's instruction to the jury on their use of statements of a coconspirator was correct, and there was no error in his not instructing in the precise terms requested by the defendant. [248-249]

A Superior Court judge correctly dismissed an indictment for conspiracy to commit murder that was not found within the six-year limitations period set forth in G. L. c. 277, § 63. [249-250]

INDICTMENTS found and returned in the Superior Court Department on August 11, 1997.

The cases were tried before *Patrick F. Brady,* J., and entry of dismissal of an indictment charging conspiracy to commit murder was ordered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*J. W. Carney, Jr. (Andrew M. D'Angelo* with him) for the defendant.

*Karen A. Palumbo,* Assistant District Attorney (*Robert M. Griffin,* Assistant District Attorney, with her) for the Commonwealth.

SPINA, J. A jury found the defendant, Joseph E. McLaughlin, guilty of armed assault with intent to murder, G. L. c. 265, § 18

(*b*), conspiracy to commit murder, G. L. c. 274, § 7, First, and conspiracy to commit armed assault with intent to murder, G. L. c. 274, § 7, Second.[1] After the verdicts were affirmed and recorded, the judge dismissed as time barred the indictment charging conspiracy to commit murder. On appeal, the defendant claims error in (1) the admission in evidence of a coconspirator's hearsay statements without adequate independent evidence of the existence of a conspiracy, (2) the admission in evidence of a hearsay statement by one of the coconspirators as a declaration of intent, and (3) the judge's failure to instruct the jury adequately on the prerequisite to consideration of coconspirator's hearsay evidence. The Commonwealth appeals from the order of dismissal. We transferred the appeal to this court on our own motion. We affirm the convictions and the order of dismissal.

There was evidence from which the jury could have found the following facts. The defendant and the victim, Marianne Lewis, were married in 1977. The first six or seven years of marriage were blissful, and the defendant was beginning to enjoy success in his real estate and business ventures. After the birth of the couple's second daughter, the defendant spent less time at home with the family. He took over from Marianne responsibility for handling the family's finances.

The defendant met a woman in 1985 with whom he had an affair over the next four years. During that time, they traveled to the Caribbean, Florida, Martha's Vineyard, and Vermont. The defendant bought the woman a necklace, a pair of earrings, and a diamond tennis bracelet. In February, 1988, the defendant planned a ten-day family trip to visit his parents in Florida. He left the family after two days, and yet was suntanned when he picked up the family at Logan Airport. When asked about it, he told his wife he had been to a tanning salon. Shortly thereafter, she opened his American Express credit card bill and asked him if he had been to St. Maarten. She never saw another American Express bill of his.

In late December, 1988, the defendant told his wife that he would be attending a real estate convention in Philadelphia that New Year's Eve with a particular colleague. He called her that weekend and spoke in a whisper so as to not wake his colleague. After the conversation ended, she called the colleague's local office. When the colleague answered, she asked him to

---

[1]The defendant moved to join the indictments for trial. See Mass. R. Crim. P. 9 (e), 378 Mass. 859 (1979).

call the defendant. The defendant returned home later that day but there was no discussion about the weekend. During 1989, the defendant was frequently away from home two to three days at a time, approximately twelve to fourteen days a month, and he never told his wife how she could reach him.

On April 19, 1989, during a birthday celebration for Marianne at her parents' home, the defendant gave Marianne a bracelet and tickets to see "Dream Girls" at Boston's Wang Theater on April 21. The couple often attended live theater during the early years of their marriage, but did so infrequently by this time. On April 21, she wore her hair down and wore a white mink coat, as the defendant requested, even though it was out of season. They arrived at the 57 Park Plaza Hotel parking garage at approximately 7:30 P.M. The performance was to begin at 8 P.M. The defendant parked his car on the fifth floor (it was the only car on that floor) at a place safely beyond all other cars in the garage, something he often did as a precautionary measure to minimize the possibility of scratches and dents caused by other drivers. The defendant asked his wife to summon the elevator while he put his car telephone, a bulky apparatus of the time, into the trunk of his car. She has no recollection of what happened next.

Between 7:30 and 7:45 P.M. a Boston police detective and a licensed security officer for the city of Boston were approached by an individual who reported that a woman had been struck by a car on the fifth floor of the parking garage. The officers rushed to that location and saw Marianne lying face down by the glass doors leading to the elevator. The defendant was standing by a white car, the only one on the fifth floor, about thirty-five feet away. The defendant was pacing with his hands in his pockets, and appeared visibly upset. He did not go near his wife, but said she had just been hit by a car.[2] Paramedics arrived shortly, and attended to her. The tissue of her scalp had been pulled forward such that all of the soft tissue and bone of her face was exposed. The paramedics had to reposition the skin over her face in order to determine where to intubate her. She was taken to Massachusetts General Hospital and treated for severe neurological distress and multiple traumas involving severe complex skull fractures, one of which left her blind in one eye,

[2]An accident reconstruction specialist from the State police later determined that the car was traveling approximately thirty-five miles per hour when it struck the defendant's wife.

a broken pelvis, and numerous lacerations and fractures about her entire body. She also suffered tears to both carotid arteries. The prognosis for death or severe neurological injury was extraordinarily high.

After Marianne was removed to the hospital, more officers arrived and began searching for the car that struck her. Tire tracks were seen extending from the sixth floor ramp in a straight line toward the glass doors where police found her. The car which struck her was found on the second floor of the garage. It showed damage on the driver's side, and blood was dripping from the undercarriage. Pieces of white fur and strands of Marianne's hair were found under the engine and on the rear wheel. The car was registered to a Stephen Mogan. No identifying fingerprints were found. Mogan had reported his car stolen while police were at the garage, and he accompanied police to the garage. He accounted for his whereabouts before and during the incident, which police verified by interviews with Mogan's friends.

Meanwhile, Marianne's life had been spared by prompt medical treatment. She was in a coma for sixteen days. During her three-month stay in the intensive care unit, the defendant's visits to his wife were infrequent and brief. He never touched her and appeared detached. She was transferred to Spaulding Rehabilitation Hospital (Spaulding) where she spent four months. The defendant's visiting pattern remained unchanged. The defendant was still seeing his paramour, who came to the marital home and met their daughters. The defendant hired a lawyer to file a civil action on his wife's behalf against the owner of the parking garage. The day Marianne was discharged from Spaulding, the defendant kept her waiting in the lobby for nearly one hour, and returned to work after dropping her off at home with their daughters. She noticed that her bed, her clothing, some personal effects, and family photographs had been removed from the home.

Some time in early fall, 1989, the defendant drove Marianne to a doctor's office and parked in a parking garage after she asked him not to. She said that she wondered why she lived after being struck by a car, to which the defendant said, "I don't know why you lived, why don't you tell me." Shortly thereafter, she commenced divorce proceedings. A final decree of divorce issued in 1995.

The defendant's investments in real estate had soured in the

late 1980's. On April 15, 1990, a $150,000 life insurance policy he had taken out on February 25, 1986, on Marianne's life lapsed.

Stephen Mogan testified[3] that some time before April 21, 1989, he received a telephone call from Brian McNeil,[4] who was tried with the defendant, asking that he come to McNeil's house for a meeting with McNeil's father, William McNeil. Mogan knew Brian and William McNeil most of his life. Mogan obliged, and met with William and Brian McNeil. William asked Mogan for the use of his car for the purpose of "ram[ming] down Marianne Lewis" at the "57 Park Plaza garage." Mogan was to receive about $2,000 for his part. Mogan testified that he spoke again with the McNeils on April 21, 1989, and was instructed by William to leave his car behind the building with the keys in the ashtray under the pretext that William McNeil would take and service the car. Mogan was further instructed to go bowling with Brian McNeil and go out to eat at a place where they would be seen, then report the car stolen. William said "Butchie"[5] from Weymouth would help with the killing.

On April 21, Mogan did as he was instructed. He and Brian McNeil, along with two friends went bowling, then ate at a Chinese restaurant, returning to Mogan's home at approximately 11:45 P.M. Mogan called a few towing companies and asked if his car had been towed. He then reported the car stolen. The next day he spoke with William, who described how he drove down the ramp and hit the victim head on, and that she had the frozen look of "a deer in the night." William said he left in another car driven by Butchie, who had been waiting in the garage. Mogan, Brian, and William agreed to stick to their story because the police had no evidence.[6]

James Short testified that in January, 1988, while he was working as a paid informant for the Drug Enforcement Administration (DEA), William McNeil told him that he had a contract of a husband on a wife. He further testified that he recorded the conversation on an electronic recording device he was wearing. An agent for the DEA testified that she listened to

---

[3]Mogan was promised probation in exchange for his "truthful" testimony.

[4]Not a party to this appeal.

[5]Butchie Falcione lived diagonally across the street from the defendant and his wife when they lived in Weymouth.

[6]The conspiracy was exposed after Mogan's former girl friend went to the police on advice of counsel.

the tape recording of the meeting between Short and William McNeil that took place on January 13, 1988, and prepared a written report of the incident.

1. The defendant argues that the Commonwealth failed to establish beyond a reasonable doubt by evidence independent of hearsay statements of William McNeil that the defendant was involved in a criminal conspiracy to kill his wife, and that it was therefore error to admit William McNeil's hearsay statements under the coconspirator exception to the hearsay rule. He relies on *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994), where we said that a jury "may not consider the statement of one defendant against the other until and unless the Commonwealth proves the existence of a joint venture beyond a reasonable doubt." The defendant timely objected and moved to strike the testimony, see *Commonwealth* v. *Borans*, 379 Mass. 117, 145-146 n.26 (1979), so we review under the prejudicial error standard. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

Where the issue is the *admissibility* of a coconspirator's statement the Commonwealth need only establish by a preponderance of the independent evidence that the defendant was involved in the conspiracy. See *Commonwealth* v. *Cruz*, 430 Mass. 838, 844 (2000); *Commonwealth* v. *White*, 370 Mass. 703, 709 n.7 (1976) ("an adequate probability of the existence of the common venture, including participation by the given defendant, [must] be established as a preliminary matter"). Here, the judge applied the higher standard of proof beyond a reasonable doubt, without objection from the Commonwealth. Even under the higher standard, the evidence would have been admissible, as the independent evidence establishes beyond a reasonable doubt the defendant's involvement in a conspiracy to kill his wife.

Mogan's testimony concerning his agreement with the Mc-Neils for the use of his car to run down Marianne Lewis at the 57 Park Plaza Hotel garage on April 21, 1989, did not involve hearsay testimony. Evidence of the terms of that oral agreement was not offered for the truth of the matters asserted, but as proof of an "operative" statement, i.e., existence of a conspiracy. As such, it was not hearsay. See *Telecon, Inc.* v. *Emerson-Swan, Inc.*, 17 Mass. App. Ct. 671, 673 (1984).

The defendant's involvement in the conspiracy could be shown by circumstantial evidence. See *Commonwealth* v. *Soares*,

384 Mass. 149, 159 (1981). Further, and contrary to the defendant's contention, "[i]t is not essential to a conspiracy that parties meet or that they confer or formulate their plans. Common purpose may be inferred from concerted action converging to a definite end." *Commonwealth* v. *Beal*, 314 Mass. 210, 224 (1943). The defendant's presentation of his wife at the time and place where others conspired to kill her could be viewed by the judge in the first instance as incompatible with a happenstance convergence of unrelated forces. The defendant's seemingly renewed interest in his wife and her love of the theater while he was steeped in an extramarital affair could be viewed as a ploy to get her to where she would be killed. His request that she wear her hair down and that she wear her white mink coat out of season could be viewed as false interest masking a plan to identify her for her killer, who waited beyond the point where the defendant would predictably park his car. His undertaking to arrange for the filing of a civil action on behalf of his wife, for whom he otherwise showed little or no concern, could be seen as a diversion of attention away from the conspiracy. The evidence also showed that the defendant had a motive to kill his wife: he had no interest in her, and his weakening financial situation would be improved by receipt of the proceeds of her life insurance policy. His attitude toward his wife after she survived the attempt on her life can fairly be viewed as one of frustrated disappointment.

William McNeil's hearsay statements to James Short were not inadmissible for want of proof by independent, nonhearsay evidence of the defendant's involvement in the conspiracy to kill his wife. Independent evidence supported beyond a reasonable doubt the inference that the defendant was involved in the conspiracy, and that execution of the plan was being coordinated by William McNeil at one end and the defendant at the other. The Commonwealth was not required to show that the defendant knew all the details of the conspiracy, or the role of each participant. It was enough to show that he was aware of the objective of the conspiracy, and was a participant. See *Commonwealth* v. *Nelson*, 370 Mass. 192, 196 (1976).

2. The defendant next contends that William McNeil's statement to James Short on January 13, 1988, that he had a contract of a husband on a wife was inadmissible as a statement of McNeil's intent because it was too remote from the inception of the conspiracy, which even the Commonwealth claimed was in

early 1989. The defendant objected before the admission of this statement, so we review under the prejudicial error standard. *Commonwealth* v. *Flebotte, supra.*

Generally, a conspirator's extrajudicial statement is admissible against a coconspirator if made during the course of and in furtherance of the conspiracy, and, as we have said, once the Commonwealth establishes the existence of the conspiracy by a preponderance of other admissible evidence. See *Commonwealth* v. *Cruz, supra; Commonwealth* v. *Nascimento,* 421 Mass. 677, 680-681 (1996). Matters surrounding the history of the conspiracy, including statements of coconspirators, may be admissible even if they predate the conspiracy. See *Commonwealth* v. *Rankins,* 429 Mass. 470, 474 (1999), citing *Commonwealth* v. *Borans,* 379 Mass. 117, 145-146 (1979). McNeil's statement about the contract was probative of his intent to kill someone and his action on that intent fifteen months later by enlisting the assistance of both his son and Mogan in an agreement that included a cover-up. See *Commonwealth* v. *Fernandes,* 427 Mass. 90, 95 (1998). A trial judge has discretion to determine whether evidence is too remote to be relevant, and absent palpable error we shall not disturb the judge's decision. *Commonwealth* v. *Rankins, supra.* Given the nature and object of this conspiracy, the defendant has failed to show error. *Id.* (no abuse of discretion in admission of letter written to defendant by coconspirator two years before killing in which she expressed love for defendant and disdain for her husband); *Commonwealth* v. *Goulet,* 374 Mass. 404, 418 (1978) (judge has discretion to admit victim's insult two years before killing as to defendant's state of mind).

3. The defendant argues that the judge's instruction to the jury on coconspirator hearsay was flawed in its failure to focus their attention on the need to reach separate conclusions that (1) a conspiracy existed (2) that involved the speaker, William McNeil, (3) and the defendant. The defendant objected to the instruction and the failure to give his proposed instruction. We review to determine whether any error prejudiced the defendant. *Commonwealth* v. *Rosado,* 428 Mass. 76, 79 (1998).

"[I]t is clear that the jury must be instructed that, before they may consider the statements of one coconspirator against another, they must make definite findings on the same questions which the judge must pass on before he may permit the jury to consider whether that evidence may be used against all." *Com-*

*monwealth* v. *Beckett*, 373 Mass. 329, 340 (1977). The judge instructed the jury that before they could consider William Mc-Neil's hearsay statements against the defendant, the Commonwealth had to prove beyond a reasonable doubt from other evidence that there was a conspiracy between the speaker (William McNeil) and the defendant, emphasizing that "of course, you're going to look at the cases against the individual defendants separately." The judge also instructed that the Commonwealth must prove beyond a reasonable doubt "that the statement was made during the conspiracy," and "that the statement was made in order to further or advance the conspiracy." The judge's instruction was an accurate statement of the law. See *Commonwealth* v. *Clarke, supra.*[7] The instruction also made clear the requirement that the Commonwealth prove a conspiracy existed between William McNeil and the defendant independent of the hearsay testimony. A judge is not required to instruct a jury using the precise terms urged by the defendant, "so long as the charge, as a whole, adequately covers the issue." *Commonwealth* v. *Anderson*, 396 Mass. 306, 316 (1985). There was no error.

4. The Commonwealth has appealed from the dismissal, post-trial on leave reserved, of the indictment charging the defendant with conspiracy to commit murder. The Commonwealth argues that the statute of limitations should not be read in a manner that leads to an absurd result, defies common sense, and defeats the intention of the Legislature.

General Laws c. 277, § 63, provides in relevant part:

> "An indictment for murder may be found at any time after the death of the person alleged to have been murdered. An

---

[7]The Commonwealth suggests in a footnote in its brief that it is illogical to require proof of a defendant's involvement in a conspiracy beyond a reasonable doubt before a coconspirator's statement may be considered against him, as it renders the admission of such statements totally unnecessary. It states, correctly, that the only decision articulating such a requirement is *Commonwealth* v. *Clarke*, 418 Mass. 207 (1994), which relied on *Commonwealth* v. *Borans*, 379 Mass. 117, 145-146 n.26 (1979), as authority for the requirement, but *Borans* does not provide support. The *Borans* case quotes *Commonwealth* v. *Beckett*, 373 Mass. 329 (1977), where we said the jury "must make definite findings on the same questions which the judge must pass on." *Id.* at 340. Whatever merit there is to the point, the question is not before us as the Commonwealth did not object to the judge's instruction. See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979); *Commonwealth* v. *Torres*, 420 Mass. 479, 482-483 (1995).

indictment for an offense set forth in [§§ 22] [rape], [22A] [rape of a child under sixteen], [24] [assault with intent to commit rape]; and [24B] [assault of a child with intent to commit rape] of [c. 265], or for conspiracy to commit any of said offenses or as an accessory thereto or any one or more of them may be found and filed within fifteen years of the date of commission of such offense. An indictment for an offense set forth in [§§ 17] [armed robbery], [18] [assault with intent to rob or murder], and [19] and [21] [stealing by confining or putting in fear] of said [c. 265] or [§ 17] [incestuous marriage or intercourse] of [c. 272] or for conspiracy to commit any such crime . . . may be found and filed within ten years of the date of commission of such offense. An indictment for any other crime shall be found and filed within six years after such crime has been committed . . . ."

A literal reading of the statute places conspiracy to commit murder by default in the six-year catchall provision, which the Commonwealth argues is incongruous with the express inclusion of conspiracy to commit an assault with intent to murder in the list of offenses subject to a ten-year period of limitations.

Criminal statutes are to be construed strictly against the Commonwealth and in favor of the defendant, under the premise that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." Commonwealth v. *Ruiz*, 426 Mass. 391, 394 (1998), quoting *United States* v. *Batchelder*, 442 U.S. 114, 123 (1979). "Criminal limitation statutes are to be liberally interpreted in favor of repose." *Commonwealth* v. *Valchuis*, 40 Mass. App. Ct. 556, 558 (1996). The plain meaning of the statute places conspiracy to commit murder in the six-year catchall provision.

The Legislature was well aware of the offenses expressly mentioned in G. L. c. 277, § 63, when it separated the ten-year limitations category of offenses in 1996 into two categories, one with a fifteen-year period of limitations and one with a ten-year period. See St. 1996, c. 26. The appropriate statute of limitations is a matter for the Legislature. There was no error in the dismissal of the indictment charging conspiracy to commit murder. The remaining convictions are affirmed.

*So ordered.*