COMMONWEALTH *vs.* WILLIAM MELANSON.

No. 00-P-752.

Suffolk. September 14, 2001. - January 15, 2002.

Present: LENK, KAPLAN, & KAFKER, JJ.

*Conspiracy. Evidence,* Conspiracy. *Practice, Criminal,* Argument by prosecutor.

At the trial of indictments charging larceny over $250 and conspiracy to commit the larceny and to make false entries in corporate books, the evidence provided by the Commonwealth was sufficient to raise for the jury the issue whether the defendant was guilty beyond a reasonable doubt of conspiring with another to achieve a larcenous purpose (with accompanying falsification of records). [580-581]

At the trial of indictments charging larceny over $250 and conspiracy to commit the larceny and to make false entries in corporate books, the judge did not err in admitting in evidence an extrajudicial statement by an alleged co-conspirator, where the statement was made in the course of and in furtherance of the conspiracy and the conspiracy was demonstrated by independent evidence. [581-582]

At a criminal trial, remarks by the prosecutor in closing argument that emphasized the strong points of the Commonwealth's case and the weaknesses of the defendant's case but that, in so doing, prompted some collateral or passing reflection on the fact that the defendant declined to testify, were not improper, where the reference to the defendant's failure to testify was at most oblique, and where the judge promptly admonished the jury to disregard the remarks, told the jury preliminarily and finally how to consider attorneys' arguments, and charged strongly on the presumption of innocence. [582-583]

INDICTMENTS found and returned in the Superior Court Department on November 10, 1997.

The cases were tried before *Charles F. Barrett,* J., and a motion for a new trial was heard by him.

*John C. McBride* for the defendant.

*Judy Zeprun Kalman,* Assistant Attorney General, for the Commonwealth.

KAPLAN, J. The defendant William Melanson appeals from his

convictions, after jury trial, of larceny over $250 (G. L. c. 266, § 30) and of conspiracy (G. L. c. 274, § 7) to commit the larceny,[1] and to make false entries in corporate books (G. L. c. 266, § 67).[2] On this appeal the defendant challenges the sufficiency of the evidence to support the conspiracy convictions. The defendant also claims error in the judge's admitting in evidence an extrajudicial statement by an alleged conspirator and in the prosecutor's making certain remarks in his closing speech; each of these errors, he contends, tainted all three convictions and warrants a new trial.

1. *Outline of the scheme as proved.* Star Market Company (Star Market) operates many retail grocery stores in Massachusetts. John Curtis was a longtime employee working as "facilities manager" in the maintenance division of the company and so was responsible for the purchase and installation of refrigeration equipment for the frozen food displays and cases in the stores. One supplier was M & S Heating and Air Conditioning (M & S), a small sole proprietorship owned and operated by the defendant, William Melanson,[3] which had been chosen occasionally by Curtis after 1991 to do duct work on heating and air conditioning systems at the stores. Another supplier was N. W. Day Company (doing business as Day Supply), operated by its president Harry See, which served as a "middleman" in obtaining refrigeration equipment from manufacturers and furnishing it to end users such as Star Market.

As a prototype of the working out of the conspiracy charged in the indictments as having occurred from April to September, 1995,[4] we take the instance at the Hyde Park store. On April 24, 1995, with Curtis's approval, a service contract issued to M & S

---

[1]The two related offenses were tried together pursuant to defendant's motion allowed by the judge. See Mass.R.Crim.P. 9(e), 378 Mass. 861 (1979).

[2]The effect of concurrent sentences on the three offenses was to sentence the defendant to one year in a house of correction, three months to be served, balance suspended, with probation for three years commencing on his release from the committed part of the sentence; he was also required to make restitution of $8,500.

[3]Evidently the company's address coincided with the home address of the defendant's parents, and the defendant operated the business out of a garage on the premises.

[4]The Commonwealth presented evidence of an additional twenty transactions between December, 1991, and March, 1995, similar to those in the later

to supply certain Bohn refrigeration equipment to that location for the contract price of $87,093.30. On May 6, 1995, M & S submitted an invoice for the stated amount indicating fulfillment of the contract. In fact M & S had not furnished any equipment. Curtis approved payment of the invoice and a check #106318 dated May 24, 1995, by Star Market issued to M & S. The defendant on May 25, 1995, endorsed the check for deposit to the M & S checking account at Andover Bank. Then the defendant on May 30, 1995, wrote a check against that account to the order of John Curtis in the amount of $84,593.30, with just $2,500 retained by M & S. The same day Curtis endorsed the check for deposit to his personal account at Baybank.

Meanwhile, Harry See's Day Supply actually furnished to the Hyde Park store the refrigeration equipment called for by the M & S contract. See, however, did not submit any Day Supply invoice for that equipment; rather he invoiced Star Market on May 5, 1995, for freon (a coolant in refrigeration systems), purportedly delivered to the Hyde Park store. The amount claimed was $81,950 and Curtis approved the payment to Day Supply. Star Market paid Day Supply by check. In fact Day Supply had not delivered any freon.[5]

The net result of the foregoing maneuvers was that Star Market paid roughly twice for the refrigeration equipment, with illicit gains of $84,593.30 by Curtis and $2,500 by the defendant through M & S.

To round out the story, Curtis submitted an invoice to M & S for refrigeration equipment Curtis himself supposedly furnished to M & S — this corresponding in description and amount with the M & S service contract with Star Market and M & S's invoice submitted thereunder. Of course, no goods were

period of the indictments. It will be enough to say that the twenty transactions resulted in total payments by Star Market to M & S's predecessor company (Melanson & Sons) of $635,000, and remittances by the company to Curtis, of $615,761, in conformance with the prototype described in our text.

[5]Over the course of dealing, Day Supply in the aggregate apparently paid more for the refrigeration equipment it furnished Star Market than it received for the freon invoiced but not delivered. About June, 1995, See told Curtis, "I have to either get the jobs the regular way or just not at all." Curtis said there would be just one more. This turned out to be the Gloucester job, mentioned *infra*.

furnished, nor was Curtis authorized to contract in his own behalf to supply equipment intended ultimately for a Star Market store. The paper transaction occurred perhaps to help the defendant and M & S gloss their false deal with Star Market in case of hostile inquiries.

In the margin we mention episodes involving the Norwood, Allston, and Gloucester stores similar to the prototype. These occurred in the April-September, 1995, interval.[6] In total, for the four stores, Star Market paid the defendant's M & S $367,257.05, and the defendant remitted $358,757.05 to Curtis.[7]

The record chronicles the unraveling of the scheme. As early as mid-1991, Dennis Carsno, a Star Market employee, questioned Curtis, then his superior, about Day Supply invoices for materials that Carsno knew had not been received by Star Market: Curtis had passed these invoices to Carsno to be processed for payment. Curtis answered, "Not to worry. I've taken care of it. It's all set." Carsno backed off for a while.

From late 1994 through August, 1995, Carsno noticed Day Supply invoices for large amounts of freon — about $40,000 per month — in fact not received, as he well knew because he was then responsible for processing vendor-supplied equipment within Star Market's maintenance division. The purchase orders for the freon, presumably approved by Curtis, were missing from the Star Market file for Day Supply — eventually these were found locked in Curtis's office. Carsno in late 1994 or early 1995 informed Star Market's president and other executives of his forebodings; after an internal investigation, the company referred the matter to the Attorney General, and grand jury action followed against the defendant and others. Curtis did not testify at the defendant's trial, but See did on the part of the Commonwealth under a plea agreement.

---

[6]The pattern in each instance followed the prototype. The M & S invoices to Star Market that initiated the scam were dated, respectively, May 30, June 16, and August 8, and the defendant through M & S wound up with a pour-boire of $2,000 in all but the one case where it was $2,500.

[7]Fending against the implications of criminality in the scheme, the defendant offers two explanations that he thinks "plausible" but we think not credible on the record: that he did "substantial duct work" for which he was entitled to be compensated by Star Market, and that he was "returning money" to Curtis which he believed to be Star Market's for material supplied by See.

2. *Evidence that defendant conspired.*[8] After moving vainly for a required finding when the Commonwealth rested, the defendant also rested, so the question is on the sufficiency of the evidence presented by the Commonwealth. The evidence was largely documentary, introduced through James McFadden, an investigator in the Attorney General's office. The bank records of M & S and Curtis together with the service contracts and suppliers' invoices exhibited how the scheme worked. Star Market employees testified to the process for payment of suppliers' invoices, Curtis's authority on behalf of Star Market to enter into contracts with suppliers and to approve payment of suppliers' invoices, his responsibility for seeing that equipment that was billed was in fact delivered, and his disability to act on his own behalf as a supplier of equipment for the Star Market stores. There was further employee testimony about Curtis's having initiated the hiring of M & S and the predecessor company as suppliers and his signing the several service contracts with them. As noted, Harry See testified. He spoke of Curtis's asking him to bill for the refrigerant, which he first took to be just "red tape." See also note 5, *supra.*

"The heart of a conspiracy is the formulation of the unlawful agreement or combination." *Commonwealth* v. *Cantres*, 405 Mass. 238, 244 (1989), quoting from *Commonwealth* v. *Pero*, 402 Mass. 476, 478 (1988). But a conspiracy rarely wears its heart on its sleeve. Thus we have no explicit proof of the defendant's "agreeing" in so many words with Curtis to join in the scheme, although we have much about transactions with M & S, the defendant's company. Agreement, however, may be instinct in the situation as a whole, and proved by circumstantial means. See *Commonwealth* v. *Nelson*, 370 Mass. 192, 200-201 (1976); *Commonwealth* v. *Cook*, 10 Mass. App. Ct. 668, 675 (1980). It is enough if the parties come even tacitly to an understanding, and this may be inferred from a course of conduct having a common design. See *Direct Sales Co.* v. *United States*, 319 U.S. 703, 714 (1943). Finally, "[t]he step from knowledge to intent and agreement may be taken. There is more

---

[8]The defendant on this appeal attacks the sufficiency of the evidence on the two conspiracy charges, but does not challenge the larceny charge on that ground.

than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." *Id.* at 713 (Rutledge, J.).

In our view, the evidence brought forward by the Commonwealth was clearly sufficient to raise for the jury the issue whether the defendant was guilty beyond a reasonable doubt of conspiring with Curtis to achieve a larcenous purpose (with accompanying falsification of records). Nor, on the strength of the record, did the jury have to reach far to bring in verdicts of guilty: the behavior, repeated with near identity from episode to episode, could hardly have occurred without conspiratorial agreement.

3. *Admission of statement.* A conspirator's extrajudicial statement made in the course of and in furtherance of the conspiracy is admissible against a fellow conspirator provided the conspiracy is shown by independent evidence. See *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976); *Commonwealth* v. *Cruz*, 430 Mass. 838, 844 (2000); *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 248 (2000). When the defendant objected to testimony about the "Not to worry" remark by Curtis, the judge ruled at sidebar that the evidence would be received de bene: the defendant could move at the close of the Commonwealth's case to strike the testimony for failure of independent evidence. This procedure is well recognized; it relieves the judge of having to make a preliminary finding that a conspiracy is shown as a condition of admitting the statement. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543-544 (1990); *Commonwealth* v. *Collado*, 426 Mass. 675, 681-682 (1998).[9] The judge agreed to defense counsel's request that he not give the jury a cautionary instruction concerning the tentative evidential status of Carsno's testimony.

The defendant had doubted the statement could be held to have been made in furtherance of the conspiracy as it was ut-

---

[9]For an elaborated Federal procedure in these matters, see *United States* v. *Ciampaglia*, 628 F.2d 632, 638 (1st Cir.), cert. denied, 449 U.S. 956 (1980); *Bourjaily* v. *United States*, 483 U.S. 171, 180-181 (1987); Fed.R.Evid. 801(d)(2)(E).

tered before the period alleged in the indictment. "The test for the admissibility of statements of coconspirators is whether they were made during the course of and in furtherance of the conspiracy, not whether they were made during the time alleged in the indictment." *Commonwealth* v. *Liebman,* 379 Mass. 671, 676 (1980). See *Commonwealth* v. *Borans,* 379 Mass. 117, 147 (1979). In fact, as appears at note 4, *supra,* the Commonwealth presented evidence of twenty transactions antedating April, 1995, so Curtis's statement fell in the actual course of the earlier phase of the very conspiracy. The cases indicate, indeed, that "[m]atters surrounding the history of the conspiracy, including statements of coconspirators, may be admissible even if they predate the conspiracy." *Commonwealth* v. *McLaughlin,* 431 Mass. at 248.

Independent proof of the conspiracy was of course brought forward, and the statement was plainly in furtherance as it was probative of Curtis's purpose to reassure and quiet Carsno and discourage further investigation or inquiry on Carsno's part.

4. *Prosecutor's closing speech.* Closing to the jury, the prosecutor said: "Star Market spoke clearly, each representative, each employee, from technician upward through Hank Wolfson [a senior manager]: no, it's not lawful. Hank Wolfson, I believe, said, that's absurd. That doesn't make sense. The only person that doesn't want to acknowledge that fact is William Melanson. The only person that doesn't want to acknowledge that he was misrepresenting to Star Market . . . ." Defense counsel moved to strike these remarks, and the prosecutor interjected he wished to withdraw them. At sidebar the judge denied a motion by the defendant for a mistrial. Counsel then asked for a prompt cautionary instruction, but added, "I don't want the court to say that the defendant has a right to remain silent . . . . I do not want to highlight that." The judge admonished the jury, "[T]he last remarks by the prosecutor are to be totally disregarded by you and put it out of your mind completely."

Counsel did not object to or criticize the judge's admonition at the time, and, in the conference with counsel after the judge's final instructions, responding to the judge's request for reactions, defense counsel answered, "I have nothing to say." On the present appeal, however, counsel suggests that the admoni-

tion did not erase an inference the jury may have drawn from the prosecutor's statement — that the defendant was somehow at fault in not taking the stand to testify and explain if he could the so-called "misrepresentation" (an inference impermissible under the Fifth Amendment to the United States Constitution).

The prosecutor's rhetorical questions came after he had summarized the Commonwealth's view of the evidence and in context could readily be understood simply in the sense of setting up a contrast between the strength of the Commonwealth's case and the manifest weakness or vacuity of the defendant's case.

A prosecutor may "emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case, even though he may, in so doing, prompt some collateral or passing reflection on the fact that the defendant declined to testify." *Commonwealth* v. *Feroli*, 407 Mass. 405; 409 (1990). "The question is whether the challenged remark, when viewed 'in the context of the entire argument,' is 'directed more at the general weakness of [the defendant's] defense than toward the defendant's own failure to testify.' " *Ibid.*, quoting from *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980). At most we have in the present case an "oblique reference" to the defendant's failure to testify, *Commonwealth* v. *Walker*, 413 Mass. 552, 560 (1992). See *Commonwealth* v. *Sherick*, 23 Mass. App. Ct. 338, 343-346 (discussing cases on either side of the line of permissibility of prosecutors' comments), *S.C.*, 401 Mass. 302 (1987), and *Commonwealth* v. *Buzzell*, *ante* 362, 366-369 (2001).

The judge's admonition was prompt and as strong as might be expected in light of counsel's stated preference. So also the jurors were told preliminarily and finally how to consider attorneys' arguments, and charged strongly on the presumption of innocence.

The judgments of conviction are affirmed.[10]

*So ordered.*

---

[10]Defendant's motion for a new trial was denied but appeal evidently was not taken from the order thereon.